# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Shauntae P.*, 2012 IL App (1st) 112280

---

| | |
|---|---|
| Appellate Court Caption | *In re* SHAUNTAE P. and KYLA P., Minors, Respondent-Appellees (The People of the State of Illinois, Petitioner-Appellee, v. Keisha H., Respondent-Appellant). |
| District & No. | First District, Fourth Division<br>Docket No. 1-11-2280 |
| Rule 23 Order filed | February 23, 2012 |
| Rule 23 Order withdrawn | April 2, 2012 |
| Opinion filed | April 5, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court properly terminated respondent's parental rights where the court's findings that respondent was unfit because she failed to maintain a reasonable degree of interest, concern or responsibility as to her children's welfare and that it would be in the children's best interests to terminate her parental rights were not against the manifest weight of the evidence. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-2280; the Hon. Bernard Sarley, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Steven O. Ross, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan Spellberg, Mary Needham, and Nancy Kisicki, Assistant State's Attorneys, of counsel), for the People.

Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Jean M. Agathen, of counsel), guardian *ad litem*.

Panel

JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.

Presiding Justice Lavin and Justice Sterba concurred in the judgment and opinion.

**OPINION**

¶ 1      This cause arises from the State's petitions to terminate the parental rights of respondent, Keisha H. (hereinafter Keisha) as to her two daughters, Shauntae P. (hereinafter Shauntae) and Kyla P. (hereinafter Kyla). Following a hearing on the State's petitions, the circuit court found Keisha unfit to be a mother pursuant to section 1(D) of the Illinois Adoption Act (Adoption Act) (750 ILCS 50/1 *et seq.* (West 2008)). The circuit court found that respondent was unfit because: (1) she had failed to maintain a reasonable degree of interest, concern or responsibility as to the children's welfare; (2) she had failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children; and (3) she was depraved based on her prior criminal convictions. See 750 ILCS 50/1(D)(b), (i), (m) (West 2008)). The circuit court further found that it would be in the minors' best interests to terminate Keisha's parental rights. Keisha now appeals the termination of her rights. For the reasons that follow, we affirm.

¶ 2                        I. BACKGROUND

¶ 3      The record below reveals the following relevant facts and procedural history. Shauntae was born on November 10, 2004, and Kyla was born on February 1, 2006. The biological parents are respondent, Keisha, and Lonnie Lee P. (hereinafter Lonnie).[1] The record reveals that the case came to the Department of Children and Family Services' (hereinafter DCFS)

---

[1]The minors' father, Lonnie, whose parental rights were also terminated, did not file a notice of appeal and is not a party to this appeal. The termination of Lonnie's parental rights is not an issue before this court.

attention in 2007 when two hotline reports were made to DCFS alleging, *inter alia*: (1) that Keisha and Lonnie were residing in a "crack house" with drug paraphernalia within reach of the children; (2) that Lonnie engaged in domestic violence against Keisha so that she obtained an order of protection against him; (3) that Keisha took the children to her mother, Debra H. (hereinafter Debra); and (4) that Debra obtained an order of protection against Keisha based on her drug involvement and alleged threats to harm herself and the children. That year, Keisha was indicated twice[2] by the DCFS for environmental neglect and for placing the children in an environment that posed a substantial risk of physical injury to them.

¶ 4 Keisha was arrested in May 2007 on an unrelated matter, and the minors remained in the care of their maternal grandmother, Debra,[3] who actively participated in the services offered to her by DCFS. After an extended period of time, Debra began experiencing health problems and financial difficulties impacting her ability to take care of the children. At that time, Keisha was residing in the Fox Valley Adult Transitional Center (a work-release program) in Aurora, and the minors' father, Lonnie, had made no contact with the children and was living in Peoria.

¶ 5 As a result, on July 29, 2008, the State filed petitions for the adjudication of wardship of both minors,[4] as well as petitions seeking temporary custody of the minors and their placement in a shelter care facility pending adjudicatory hearings in their cause. The petitions alleged that Shauntae and Kyla were dependent minors pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2008)) because: (1) their mother was incarcerated; (2) their father was prohibited by an order of protection from having contact with them; and (3) their legal guardian and maternal grandmother, Debra, was unable to care for them. The petitions further alleged that the minors were neglected based upon an environment injurious to their welfare pursuant to section 2-4(1)(d) of the Juvenile Court Act (705 ILCS 405/2-4(1)(d) (West 2008)) because "there have been instances of domestic violence between the *** parents during which the minor[s] *** [have] been present."

¶ 6 On July 30, 2008, the circuit court granted the State's petitions for temporary custody and placed Shauntae and Kyla in the care of DCFS. On October 28, 2008, the circuit court held an adjudicatory and dispositional hearing to determine the status of both minors. Keisha was

---

[2]Keisha was indicated on January 20, 2007, and March 16, 2007.

[3]At this time, Debra resided in Canton, Illinois.

[4]The petitions were originally filed in Fulton County, Illinois, because the minors and Debra resided in Canton, Illinois. The case was subsequently transferred to Cook County because Debra moved there and Keisha expressed to the court that she "intended to parole" in Cook County. The case was officially transferred to Cook County on November 3, 2008.

not present, but was represented by counsel.[5] After a hearing, the circuit court entered written adjudicatory and dispositional orders, adjudging the minors dependent and neglected due to exposure to an injurious environment (*i.e.*, domestic violence between the parents). The court found both parents unable and unfit to care for the girls, and Debra unable to care for them. The court made the children wards of the State and placed them in DCFS custody.[6]

¶ 7 The circuit court also entered a permanency goal of returning the minors home within 12 months, and in order to achieve this goal ordered Keisha to comply with the terms of her DCFS service plan, including undergoing a substance abuse evaluation. The court also ordered both parents to cooperate with DCFS and correct the conditions that required the minors to be placed in the care of DCFS or risk termination of their parental rights.

¶ 8 The record reveals that DCFS initially placed Kyla and Shauntae into foster care with their maternal aunt, Frances H., an Evanston police officer, with whom they resided for almost a year. However, after Frances gave DCFS a 14-day notice indicating that she could not take care of the children because of her work schedule, on July 1, 2009, DCFS placed Shauntae and Kyla in a traditional nonrelative preadoptive foster home with Kyle and Karen H. (hereinafter Kyle and Karen).

¶ 9 On July 23, 2009, the juvenile court of Cook County held a permanency hearing to determine the biological parents' progress in regaining custody of the two minors. Two witnesses testified before the court, Wilfred Mateo, the DCFS social worker responsible for the minors' welfare, and Kathy Berry, the DCFS social worker responsible for the reunification of the family. At that hearing, Mateo testified that Kyla and Shauntae were doing well in their new foster home, which appeared to be a safe and appropriate environment for them. He stated that they continued to participate in individual as well as play therapy in order to cope with separation from their mother.

¶ 10 Berry testified that although Keisha was paroled from prison on January 2009, she had not heard from her until June 2009. According to Berry, Keisha had not completed any of the substance abuse or mental health services that were recommended by DCFS and she had been inconsistent with her visitation of the minors. Keisha told Berry that she wanted her mother, Debra, who now resided in Arizona, to regain legal guardianship of the minors, and stated that she too intended to move there. Berry testified, however, that Keisha's plan to move to Arizona with the children may not have been feasible because of Keisha's parole obligations in Illinois.[7]

¶ 11 After hearing the testimony of the two witnesses, the circuit court entered a permanency

---

[5]The record reveals that Keisha requested not to attend the adjudicatory hearing and an order vacating the writ or petition to produce the inmate was entered on October 23, 2008 prior to that hearing.

[6]Keisha does not challenge the validity of either the adjudicatory or dispositional order and the record on appeal does not contain the transcript of either of these proceedings.

[7]Berry also testified that Lonnie has not completed any of the services recommended by DCFS, except for the initial integrated assessment interview.

order finding that the parents had not made significant progress, despite reasonable efforts by DCFS in providing services to facilitate achievement of the permanency goal. The court, therefore, recommended a goal of "return home pending status."

¶ 12 On December 1, 2009, the court held a second permanency hearing, at which it again heard the testimony of Mateo and Berry. Mateo testified that although Keisha has been allotted weekly supervised visits with the children, she continues to be inconsistent and generally meets her daughters once a month. Mateo acknowledged, however, that Keisha lives in Aurora and that the visits are at a McDonald's in Chicago, so that it might be difficult for Keisha to keep all the appointments.

¶ 13 Mateo admitted that Keisha's visits with the children generally "go well" with no "unusual incidents," but reported that on one occasion Keisha inappropriately made promises to her daughters about reunification, telling them that "soon she would find a job, get a home, and a car, and they would all live together again." The foster parents reported that after this visit the children were upset and would not comply with their requests. Mateo also testified that a couple of months ago, Keisha brought a male friend to her visit with the children. According to Mateo, even though after this incident she was told that "unapproved visitors" (*i.e.*, anyone but her and her sister, Frances) were not allowed at the meetings, Keisha continued to come to the visits with other individuals.

¶ 14 Mateo also testified that the foster parents have reported to him that Shauntae has exhibited sexualized behavior and that they have asked Shauntae's therapist to recommend a psychosexual evaluation assessment.

¶ 15 Berry next testified regarding Keisha's participation in the DCFS-recommended substance abuse and mental health services. Berry testified that after she was paroled in March 2009, Keisha told her that "she was receiving services from parole." However, Berry explained that "parole did not give [Keisha] any referral for services because [Keisha had told them that] she was working through DCFS to get services *** [and] they were just kind of waiting to hear from other providers that they thought were referring her." According to Berry, when it came to light that Keisha was not receiving any services through parole, she referred Keisha for a substance abuse evaluation and individual counseling. Keisha consistently attended her weekly therapy sessions, but was not successful with her substance abuse problem. After her initial substance abuse evaluation in July 2009, Keisha was recommended for level 1 outpatient treatment, which required her to do urine testing every two weeks. Keisha was inconsistent with her treatment and missed several urine tests. According to Berry, on November 5, 2009, Keisha tested positive for cocaine and marijuana and was therefore sent to intensive outpatient treatment on November 23, 2009.[8]

¶ 16 After hearing the testimony of the two witnesses, and considering DCFS's integrated

_____

[8]Berry also testified that Lonnie had not visited the children in months and that DCFS had lost all contact with him.

assessment report[9], which was introduced as an exhibit, the circuit court entered a permanency goal of "substitute care pending court determination on termination of parental rights." In doing so, the court found that Keisha had not made substantial progress in services geared toward reunification, despite reasonable efforts by DCFS in providing services to facilitate achievement of the permanency goal.

¶ 17 On April 27, 2010, the State filed supplemental petitions seeking findings of parental unfitness, involuntary termination of parental rights, and the appointment of a guardian with the right to consent to adoption (hereinafter termination petitions). In relevant part, the termination petitions alleged that Keisha was unfit in that she had failed to maintain a reasonable degree of interest, concern or responsibility as to her children's welfare (750 ILCS 50/1(D)(b) (West 2008); 705 ILCS 405/2-29 (West 2008)), and that she had failed to make reasonable efforts to correct the conditions that were the basis for the children's removal, or to make reasonable progress toward the children's return within the first nine months after the adjudication of neglect (October 31, 2008) or within any nine-month period thereafter (750 ILCS 50/1(D)(m) (West 2008); 705 ILCS 405/2-29 (West 2008)). The State also alleged that Keisha was unfit because she was addicted to drugs for at least one year immediately prior to the commencement of the unfitness proceeding (750 ILCS 50/1(D)(k) (West 2008); 705 ILCS 405/2-29 (West 2008)).[10]

¶ 18 In addition to alleging that the parents were unfit, the termination petitions alleged that Kyla and Shauntae have been residing with their foster parents since July 1, 2009, that the foster parents desired to adopt them, and that adoption by the foster parents would be in the children's best interests.

¶ 19 On May 20, 2010, the minors' maternal grandmother, Debra, filed a motion to intervene, seeking legal guardianship of the two minors. Debra's petition alleged that Keisha was out of state,[11] but that she had asked Debra to intervene and request that Kyla and Shauntae be placed with Debra. In the petition, Debra also requested visitations with the children and a clinical staffing.

¶ 20 On June 11, 2010, the circuit court held a third permanency hearing. At that hearing the court maintained the goal of "substitute care pending a court determination on termination

---

[9]This nearly 50-page report noted, *inter alia*: (1) that by August 2008, Keisha had been arrested 13 times; (2) that she has used drugs her entire life and sold drugs to get money to buy more drugs; (3) that while incarcerated at the Fulton County jail, she was diagnosed with bipolar disorder; (4) that during her interview for the integrated assessment, she exhibited an upbeat affect, which was not always congruent with the content of the discussion (*i.e.*, the extent of the domestic violence in her relationship with Lonnie); and (5) that she lacked responsibility for her choices, appearing indifferent to the effect they had on others, particularly on her daughters.

[10]The termination petitions also alleged that Lonnie was an unfit father because he had deserted the children during the three months prior to the commencement of the proceedings to terminate parental rights. 750 ILCS 50/1(D)(c) (West 2008); 705 ILCS 405/2-29 (West 2008).

[11]The record reveals that at the time, Keisha was in Colorado, where she was arrested.

of parental rights," noting that the termination petitions had already been filed and were pending, and that the foster home was safe, appropriate and preadoptive. The circuit court denied Debra's motion to intervene, but ordered DCFS caseworker Mateo to ensure that a clinical staffing took place. The court also ordered a mediation between all the interested parties, including the foster parents. Mediation was held on July 27, 2010, but no agreement was reached.

¶ 21 On September 22, 2010, Keisha filed her answer to the termination petitions, denying the allegations therein, and raising what she titled two "affirmative defenses." Specifically, Keisha alleged that DCFS had failed to make reasonable efforts to assist her by failing to assign her a caseworker or to provide her any services between July 2008 and March 2009. Keisha also alleged that DCFS failed to give her credit for services she had completed, including a certificate for a 12-week advanced parenting course completed on or about April 23, 2008, at the Decatur Correctional Center, and certificates for completed courses in anger management and drug treatment.

¶ 22 On January 11, 2011, the State amended the termination petitions to add an allegation that Keisha was unfit based on depravity, because she had been convicted of at least three felonies, and at least one of these convictions occurred within five years of the filing of the termination petitions. See 750 ILCS 50/1(D)(i) (West 2008); 705 ILCS 405/2-29 (West 2008). Keisha filed her answer to the supplemental termination petitions on March 9, 2011, stating "[a]ll previous answers to the State's petition stand as previously pled." In this pleading, she made no mention of "affirmative defenses."

¶ 23 After a fourth permanency hearing on January 22, 2011, the circuit court again entered an order maintaining a goal for Shauntae and Kyla as "substitute care pending court determination on termination of parental rights."[12]

¶ 24 On April 11, 2011, the circuit court commenced its hearing on the State's termination petitions. Prior to any testimony, Keisha informed the court that she was willing to sign specific consent forms to the adoption of her daughters by their maternal grandmother, Debra. This motion was denied by the circuit court because Debra was not the minors' foster parent and did not have custody of the children in the past six months.

¶ 25 The court then proceeded with the fitness portion of the hearing. The State began its case by introducing documentary evidence into the record, including: (1) certified copies of the original adjudication and dispositional orders for the minors entered on October 31, 2008; and (2) certified copies of Keisha's convictions, including six forgery convictions. Five of

---

[12]The record reveals that on March 10, 2011, Keisha filed a petition for visitation with her daughters, in which she alleged that she was currently incarcerated at the Dwight Correctional Center, serving a two-year sentence for forgery/theft. Keisha alleged that her last in-person visit with the girls was in January 2010, but that she then had to go to Colorado to "take care of a traffic warrant from 2006." Keisha alleged that her last "web visit" with the children was in October 2010, but that she has attempted to make positive contact with the children by letters, telephone calls, pictures and cards that she has sent through her attorney or through Debra. Keisha's motion for visitation was subsequently denied.

-7-

these convictions were from Peoria County and one was from Kane County. Three of these convictions were entered in August 2001, and the remaining three were from October 2001, December 2007, and December 2010.

¶ 26    The State next proceeded by calling three witnesses: Robyn Chamblin, Kathy Berry, and Wilfred Mateo. Robyn Chamblin, a DCFS child welfare worker from Peoria County, first testified that she was assigned to Kyla and Shauntae's case in August 2008, when the case was transferred from Fulton to Cook County because the minors were placed with their aunt, Frances.

¶ 27    Chamblin testified that when she first visited the minors, she realized that she had a conflict of interest, as she was personally acquainted with Frances, and needed to remove herself from the case. As a result, in November 2008, the case was transferred to Cook County DCFS worker Mateo. Chamblin, however, remained on the case as the worker responsible for providing services to the parents between August 2008 to March 2009.

¶ 28    Chamblin testified that in August 2008, when she was initially assigned to the case, Keisha was in a state correctional work-release program in Aurora. Chamblin visited Keisha at the work-release facility between August and November 2008. During the visits, Chamblin and Keisha discussed the services DCFS had recommended for Keisha, including: a psychological evaluation, substance abuse services, counseling, services to address her criminal history and domestic violence, and parenting classes. Chamblin gave her contact information to Keisha but could not remember whether she asked Keisha to contact her when she was released so that they could meet and Chamblin could provide Keisha with referrals for all of the necessary services. Chamblin and Keisha also discussed what services Keisha might be able to obtain while in the work-release program, and Keisha signed consent forms for the release of information between DCFS and the Department of Corrections (DOC). The documents received by DCFS from the DOC revealed that while in the work-release program Keisha completed several urine tests and a parenting class. Chamblin explained, however, that DCFS considered these two services insufficient under the service plan.

¶ 29    According to Chamblin, in November 2008, Keisha was returned to the Dwight Correctional Center because she violated work-release rules. Chamblin could not visit Keisha at Dwight, because "Keisha was in reception and could not receive visits." Chamblin testified that she learned that Keisha was paroled in January 2009. Soon thereafter, in March 2009, Chamblin was removed from the case. Chamblin reiterated that up to that point, Keisha had not completed any of the services recommended to her under the DCFS service plan.

¶ 30    Kane County DCFS supervisor Berry next testified that she took over the case from Chamblin and served as the DCFS family caseworker from March 2009 to March 2010. Berry's primary responsibility was to work with the parents toward reunification.

¶ 31    Berry testified that her first contact with Keisha was on March 31, 2009, at the DCFS office. Keisha told Berry that she had been paroled in January 2009 and that this was her second time being on parole for the same offense. Berry recommended that Keisha participate in a substance abuse evaluation, a psychological evaluation, individual counseling to address mental health issues, domestic violence counseling, parenting and satisfaction of any parole requirements. Keisha told Berry that her parole officer would refer her for

services. Keisha gave Berry the parole officer's contact information and again signed consents for release of information between the parole office and DCFS. Berry provided Keisha with her contact information and asked her to stay in regular contact with her.

¶ 32    In the following months, Berry attempted to stay in touch with Keisha and to verify that Keisha had completed the required services through her parole officer, but was unable to do so. Berry completely lost contact with Keisha until June 15, 2009, when Keisha telephoned her stating that she was not in services and that she needed referrals. Berry referred Keisha for a substance abuse evaluation at Breaking Free, in Aurora,[13] and later that month, referred her for individual counseling at Family Counseling Services.

¶ 33    Berry said that she next met with Keisha in November 2009, and that as of that date, Keisha had not completed either the outpatient drug treatment or the individual counseling that she had recommended for her. Berry explained that, as a result, she was unable to refer Keisha for a psychological assessment or parenting classes. It was DCFS's policy that prior to engaging in any such services, Keisha had to show that she was refraining from substance abuse.

¶ 34    Berry further testified that in November 2009 she and Keisha attended a child and family team meeting at the DCFS office in Aurora. At this meeting, Keisha was told that she needed to attend her substance abuse treatment consistently and to prove that she was not taking drugs by submitting to urine analysis and testing negative for substances. Keisha signed a contract to this effect.

¶ 35    Berry testified that she next had a telephone conversation with Keisha in December 2009 to address the results of Keisha's recent random urine analysis, and that during this conversation, Keisha admitted to her that she had used cocaine. In accordance with Breaking Free's recommendation, Berry advised Keisha to partake in an inpatient substance abuse treatment and referred her to Stepping Stones in Joliet. Keisha agreed to attend the evaluation and receive the treatment. Keisha told Berry that she needed a ride to Stepping Stones, and Berry made a referral to a transportation service. According to Berry, the appointment was set for December 21, 2009, but before the transportation arrived to pick Keisha up, she called to cancel her evaluation.[14] The evaluation was never rescheduled. Berry explained that shortly thereafter, when she attempted to contact Keisha (in January and February 2010), she learned that Keisha had left the state and relocated to Colorado.

¶ 36    Berry testified that she was removed from the case in March 2010. As of that date, Keisha had not completed any of the recommended services, including the inpatient evaluation at Stepping Stones, inpatient drug treatment, or individual counseling, which would have permitted Berry to refer her for further necessary services.

¶ 37    On cross-examination, Berry acknowledged that there was documentation that Keisha had completed a parenting class while in the DOC. She explained, however, that DCFS wanted Keisha to take an additional parenting class when the time came because it was

---

[13]Referrals were made for services in Aurora because Keisha resided there at the time.

[14]Berry also acknowledged that the transportation service was late in picking Keisha up.

DCFS's policy that the DCFS-referred classes were more thorough than those offered by the DOC.

¶ 38    After Berry's testimony, the State called DCFS worker Mateo. He testified that he was initially assigned as Kyla and Shauntae's placement worker[15] in November 2008, but that since March 2010, he has also acted as the family caseworker.

¶ 39    Mateo testified that he first met Keisha during a court date in January 2009. At that time, Mateo advised Keisha that she was entitled to weekly supervised visits, which were to occur at the home of the girls' then-foster-mother Frances. The visits were to be supervised by Frances or the children's grandmother, Debra. Debra and Frances were to report back to Mateo, and he would then rate Keisha's visits and make his assessment and recommendations regarding future visits. Mateo admitted that contrary to DCFS rules and regulations, at this time, neither he nor anyone else from DCFS observed any of the visits in Frances' home.[16] He testified that prior to May 2009, he rated Keisha's visits as unsatisfactory.

¶ 40    In May 2009, the location of the visits was changed to the DCFS office in Skokie, because Frances told DCFS that the "visits were not going according to plan." At this point, Mateo began supervising the visits.

¶ 41    According to Mateo, in July 2009, the children were placed in a nonrelative foster family with Kyle and Karen, after Frances expressed that she could no longer take care of them because of work schedule conflicts. The location of the visits was again changed to a McDonald's in downtown Chicago.

¶ 42    Mateo testified that on January 4, 2010, he had a telephone conversation with Keisha in which he informed her that the permanency goal had been changed.[17] He explained the termination process to her and informed her that termination could be either voluntary or involuntary. When Mateo asked Keisha if she was engaged in reunification services, Keisha told him that she had been attending intensive outpatient at Breaking Free but that she was advised to do an inpatient program because of a missed urine analysis. Mateo asked Keisha whether she was using any controlled substances and she told him that she was using marijuana.

¶ 43    Mateo averred that the next conversation he had with Keisha was on January 11, 2010. At this time, Keisha told him that she was living in Denver, Colorado, and requested that her monthly visits with the children be made through a web camera. Keisha did not request any

---

[15]As a placement worker, Mateo was responsible for supervising the visits between Keisha and her daughters.

[16]DCFS rules and regulations require a caseworker to observe supervised visits.

[17]After this, Keisha expressed a willingness to sign specific consent forms to the adoption of her children. However, she never told Mateo whether she intended the specific consents to apply to Kyle and Karen, or to her mother, Debra. Mateo told Keisha to consult her lawyer regarding specific consent forms.

in-person visitation after January 2010, and no such visits were made.

¶ 44     After Mateo's testimony, the State and the public guardian rested. Keisha next testified on her own behalf. She stated that she is 31 years old and that she is currently residing at the Dwight Correctional Center, with an out date of November 10, 2011. Keisha averred that since she came into the DCFS system, she has engaged in services outside of those provided by DCFS. She explained that when the case began she was in a work-release program, which she first entered on July 1, 2008. Prior to that she was incarcerated at the Decatur Correctional Center in Decatur, Illinois. In July 2008, she met with DCFS caseworker Chamblin, who gave her a DCFS service plan, but then told her that she would not be her caseworker and that she could not refer her to any services.

¶ 45     Keisha testified that, as a result, she spoke to Gary Puckett, her counselor at the work-release center, and began obtaining services on her own. These included: domestic violence counseling at Mutual Grounds Counseling (Mutual Grounds), a domestic violence shelter in Aurora; two to three weekly Narcotics Anonymous/Alcoholics Anonymous (NA/AA) meetings at the work-release facility; several Bible study groups, and urine analysis. Keisha testified that she paid for her own urine analysis because she did not have a caseworker to assign or refer those services to her.

¶ 46     Keisha further averred that she regularly maintained her visits with Kyla and Shauntae. Between October and November 2008, she had three visits with her daughters at the work-release facility, where they were brought by Debra. Afterwards, Keisha obtained weekend passes to visit Kyla and Shauntae at her sister's home in Evanston and spent nights there. Keisha explained, however, that she made only "a couple" of such visits because she was transferred to the Dwight Correctional Center for the last 45 days of her sentence. Keisha had no more visits with the children until her release date on January 23, 2009.

¶ 47     Keisha stated that after she was released from prison, she resumed her weekend visits with the children at her sister's home in Evanston. After a while, however, her sister requested that the visits be moved to the DCFS office in Skokie. Keisha explained that this request was made because of "personal issues" between her and her sister. Keisha testified that she continued to visit her daughters every Saturday at the DCFS office, and that the visits would usually last one or two hours, depending upon the caseworker's schedule.

¶ 48     Keisha stated that she stopped visiting her daughters in June 2009 because she lost her job and could not get to the DCFS office. Keisha testified that although she told Mateo that she needed transportation assistance and he forwarded the message to Berry, it took two months before she received train tickets from DCFS and the visits were moved to a McDonald's. Once the transportation problem was resolved, the visits resumed regularly, until November 2009, when Keisha had a relapse. Keisha stated that she missed two visits in November, but that each time she informed both the transport worker and the foster family that she would miss the visits. Keisha had only two visits in December 2009, and only one visit in January 2010, before she moved to Colorado.

¶ 49     Keisha explained that she moved to Colorado because she learned she had warrants there that "needed to be taken care of." She believed that she could not get her children back if she had outstanding warrants. Keisha testified that she stayed at a friend's home in Colorado

while her case was pending before the Colorado court. Keisha explained that on June 30, 2010, she was sentenced by a Colorado court to 90 days in jail for "driving under false information" and she had to turn herself in. Keisha served her 90 days in Colorado and was released on September 24, 2010. At this time, she was extradited back to Illinois to take care of pending charges in this state.

¶ 50    Keisha testified that once she moved to Colorado, her visits with her daughters were reduced to once a month, and she arranged to have them done through a web camera. Those visits took place from January 2010 to June 2010. Keisha tried to maintain contact with her daughters by sending them letters, cards, and pictures, and attempting to make telephone calls, which were rejected by the foster parents.

¶ 51    Keisha stated that after she returned to Illinois, a governor's warrant was issued against her on November 10, 2010, and she was transported first to the Kane County jail on November 21, 2010 and then to her current location, at the Dwight Correctional Center. She continued to have monthly telephone conversations with her daughters, and to send them letters and pictures and cards. These cards and letters were admitted as exhibits into evidence. Keisha petitioned for visits, but was denied. She stated that the visits would take place in the prison visiting room where there is a play area for children with snacks, toys, coloring books and games. Keisha believed that the children would not be traumatized by a jail visit because the foster parents had already told them Keisha was in prison.[18]

¶ 52    Keisha next testified that she continues to be engaged in several services. She is in the third month of a six-month inpatient prison drug treatment program, called WELLS (Women Encouraging Lifelong Sobriety). This program is located on separate grounds from the rest of the prison inmates. Keisha stated that she enrolled in this program because she "wanted to better herself and learn how to stay sober and to be a good mother to her children."

¶ 53    Keisha also testified that she has completed a class that teaches women the skills they need to get out and stay out of prison. She took part in a Bible study weekend retreat where women worked with female prisoners to help them with personal issues (such as, mental health or a criminal background). Keisha has also almost completed an anger management class for which she will receive a certificate. She is enrolled in a Lakewood College math class and is about to graduate from a self-esteem class. She is also starting a parenting class in two days.

¶ 54    Keisha further averred that in 2008, she completed a 12-week, advanced parenting class, while at the Decatur Correctional Center for which she received a completion certificate. When Keisha's counsel attempted to introduce this certificate into evidence, the State and the guardian *ad litem* objected on the grounds of hearsay and lack of foundation. The circuit court sustained this objection, noting that the certificate was not certified, and there was no testimony or evidence as to where it came from, other than Keisha's statement that she received it upon the completion of the class.

_____

[18]Later in the proceedings, the circuit court inquired of Mateo why Keisha had not been granted a physical visit with the girls for almost a year and Mateo replied that Keisha was in jail and that the therapists were not recommending that the girls have prison visits.

¶ 55    On cross-examination, Keisha admitted that she did not finish either the outpatient or inpatient drug treatment programs recommended to her in 2009, and that instead of participating in these programs, she moved to Colorado with no advance notice to any of the caseworkers.

¶ 56    After Keisha's testimony, the court heard from Garry Puckett, a counselor at the Fox Valley Adult Transition Center, the correctional work-release program that Keisha attended in 2008. Puckett stated that he was subpoenaed to testify at trial. He explained that he is one of three correctional counselors at the work-release center, which houses 128 female inmates, and that he is responsible for a third of that population. Puckett's job was to supervise the services engaged in by each resident (including drug counseling, GED classes, and work in the community), to monitor each resident's progress and to be the repository for any paperwork related to services. Puckett described the inmates at the work-release center as "the cream of the cream." He explained that in order to enter the program these residents had to fulfill several requirements, including: (1) be low-escape risk individuals; (2) be within 24 months of their parole; (3) be convicted of nonviolent offenses; (4) have a good disciplinary record while in the DOC; and (5) undergo a mental health evaluation.

¶ 57    Puckett testified that there are four "levels" at the work-release program and that to progress through the levels, residents need to obtain employment, avoid disciplinary issues, participate in programming to better themselves and prepare for release into community. Puckett was Keisha's counselor between July 2008 to November 2008. As of July 31, 2008, Keisha had obtained employment at Dunkin Donuts, was attending in-house programming and had no disciplinary violations since her arrival. As a result, she had fulfilled the three basic requirements for advancing to "Level 2" and was promoted to that level. Puckett said that Keisha eventually reached "Level 3," allowing her 6 hours per week of passes in the community and a monthly 48-hour pass, which allowed her to spend a night outside of the work-release center.

¶ 58    Puckett testified that when he initially met Keisha, he was aware that she had an ongoing case with DCFS. He stated that this was common at the work-release center and that he tried to counsel all of his inmates with similar problems to immediately get involved with programs and whatever the service contract with DCFS required. According to Puckett, the work-release center tried to assist its residents to the best of its ability and to work with them to fulfill their DCFS contracts.[19] Puckett explained that it was common for the residents to attend services outside of the work-release facility because the program sought to incorporate the residents into the community. Accordingly, anything available to the citizens in the Aurora area was also available to the residents. Residents obtaining services outside the work-release center were required to fill out a written request to attend a service in the community and could not leave the facility without a signed pass from a counselor. Verification of attendance at outside services was also mandatory.

---

[19]When Puckett was asked whether the services offered by the work-release center met DCFS requirements, the State objected on the grounds of lack of foundation, and this objection was sustained by the circuit court.

¶ 59     Puckett testified that Keisha engaged in several services while at the work-release center. She participated in a peer-led support group called "Inner Circle," and attended several in-house meetings of NA/AA in July and August 2008. She also attended a meeting of Seeking Safety, a self-esteem program led by a staff member, on July 13, 2008. Keisha also attended four domestic violence and sexual abuse counseling sessions (in August and October 2008) outside of the work-release center, at Mutual Ground in Aurora.[20] Puckett could not recall how much contact he had with DCFS regarding Keisha's case. He did recall, however, that on October 2, 2008, he faxed Chamblin the results of Keisha's urine analysis completed on September 28, 2008.[21]

¶ 60     Puckett was next questioned about Keisha's cumulative counseling summary report. He explained that the report was part of Keisha's master file and that it included counseling summaries prepared by him during Keisha's time in the work-release program, as well as summaries made by other DOC workers prior to July 2008, when Keisha entered the program.

¶ 61     Puckett admitted that on several occasions in his summaries he noted that Keisha exhibited "attitude problems." Specifically, on August 15, 2008, Puckett noted that Keisha was immature and needy and nothing was ever "enough" or "fast enough" for her. Puckett explained to Keisha that her attitude was counterproductive. Puckett testified, however, that Keisha's attitude during this session was not serious enough to prevent her from advancing to "Level 2" in the work-release program. On October 20, 2008, Puckett noted in the counseling summary that Keisha continued to exhibit problems following instructions and that he again spoke to her about her seeming inability to listen and to look at a problem from someone else's point of view. Puckett, however, disagreed with the State's assessment that Keisha was having issues taking the program seriously, pointing out that she had been promoted to "Level 3" prior to this session, so that she "must have been doing something right." Puckett again talked to Keisha on November 3, 2008, noting in his summary that he "once again" encouraged her to seek individual therapy to address her continued inability to focus on her own issues and to listen to others.

¶ 62     Puckett was next shown Keisha's certificate of completion for a parenting class at the Decatur Correctional Center. He stated that he was not familiar with the certificate, adding that it was not part of Keisha's master file. He did not know how the certificates were prepared or who prepared them. The State again objected to the introduction of the document into the evidence, and the circuit court sustained the objection.

¶ 63     Puckett testified that in November 2008, Keisha was returned to the Dwight Correctional Center, for "unauthorized movement." He explained that "unauthorized movement" included

---

[20]Sign-in sheets for four Inner Circle meetings in July and August 2008 were admitted into the evidence, as were records of Keisha's in-house NA/AA meetings, her attendance records for the Seeking Safety program and records of her violence and sexual abuse counseling sessions at Mutual Grounds.

[21]Defense counsel attempted to introduce this fax into evidence, but the circuit court denied this request on the basis of relevance.

any movement by a resident without permission, including, for example: a resident failing to appear at her work schedule; a resident exceeding the time limit of a pass, or a resident violating the location specifically permitted by a pass. Puckett stated that after Keisha's transfer to Dwight, he had no further contact with her.

¶ 64       After Puckett's testimony, Keisha's counsel rested and the parties presented closing arguments in the unfitness phase of the hearing. The State argued that based on her six felony convictions for forgery, Keisha was depraved pursuant to subsection 1(D)(i) of the Adoption Act (750 ILCS 50/1(D)(i) (West 2008)). The State contended that the evidence also established that Keisha had not only failed to make reasonable efforts or progress toward reunification, but had also failed to maintain a reasonable degree of interest concern or responsibility for her daughters, making her unfit pursuant to subsections 1(D)(b) and (m) of the Adoption Act (750 ILCS 50/1(D)(b), (m) (West 2008)). The State pointed out that Keisha had been given more than nine months after the October 2008 adjudication to fulfill the requisite DCFS services aimed at reunification. Keisha was offered and recommended numerous services immediately after being released from prison, including substance abuse programs, individual therapy and domestic violence counseling, but had failed to avail herself of any of them. The State further noted that nearly a year after the October 2008 adjudication, Keisha admitted to relapsing on cocaine and marijuana.

¶ 65       The guardian *ad litem* agreed with the State and added that Keisha's continued criminal activity established that she was not making the requisite progress toward reunification. The guardian *ad litem* pointed out that the only services utilized by Keisha were those offered to her while she was in the work-release program between July and November 2008, and these were "sporadic at best." The guardian *ad litem* also found relevant that Keisha failed to actually complete the work-release program and was returned to the DOC. According to the guardian *ad litem*, no services were completed after this point.

¶ 66       Keisha's counsel, on the other hand, argued that Keisha had engaged in services as much as she could. He argued that the necessary services had not been provided to her and that there was a period in the initial stage of the case, when Keisha did not have a caseworker and was not told what services she was supposed to be engaged in. Counsel also argued that Keisha had completed a mental health assessment that allowed her to advance to the work-release program. He noted that Keisha participated in domestic violence counseling and a self-esteem group similar to group therapy and that there was evidence that she had participated in a parenting class.

¶ 67       After hearing arguments, the circuit court found Keisha unfit on three grounds. Based upon Keisha's convictions for forgery, the court found that the State had established that Keisha was unfit based on depravity as defined by subsection 1(D)(i) of the Adoption Act (750 ILCS 50/1(D)(i) (West 2008)). The court also found that the State had proved by clear and convincing evidence that Keisha had failed to maintain a reasonable degree of interest, concern or responsibility for her children making her unfit pursuant to subsection 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2008)). The court specifically noted that although Keisha had participated in some services, the fact that she had been in custody for such a long period of time "at the very least indicated a lack of responsibility as to the children's welfare." The court also found that the State had proved by clear and convincing

-15-

evidence that Keisha had failed to make reasonable efforts or reasonable progress toward reunification with her children making her unfit under subsection 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2008)). In this respect, the court noted that although Keisha participated in some services while in jail, overall there were a number of periods of time during which she failed to make any such efforts.

¶ 68    After making its findings regarding parental unfitness, the court immediately commenced the second portion of the termination hearing, addressing the best interests of Shauntae and Kyla. Caseworker Mateo again testified, this time regarding the children's current foster home. He stated that since July 2009, six-year-old Shauntae and five-year-old Kyla have been living in a traditional, two-parent, preadoptive family, with Kyle and Karen. He testified that since July 2009, he has visited the girls in the foster home at least once a month (with the most recent visit being on July 6, 2011) and that he has observed the home to be a safe and appropriate environment, with no signs of abuse, neglect or corporal punishment.

¶ 69    According to Mateo, the older child, Shauntae, who has just completed kindergarten, calls the foster parents "mommy" and "daddy" and in his recent home visit on July 6, 2011, told him that she feels safe and secure in the foster home. After observing the interaction between Shauntae and her foster parents, Mateo described it as "free" and "close."

¶ 70    Mateo further testified that Shauntae is in individual therapy and has also been in specialized therapy to address inappropriate sexualized behavior. The behaviors were primarily "touching incidents." The first of these occurred while Shauntae was still placed with her maternal aunt, Frances, but it did not come to light until after she was placed with Kyle and Karen. Mateo explained that the foster parents reported the incidents of Shauntae's sexualized behavior to him and that she was then immediately recommended for therapy. In the past six months, however, there have been no more sexualized behavior incidents.

¶ 71    Mateo next testified about the younger minor, Kyla. According to Mateo, Kyla has just finished a pre-kindergarten program and her individual play therapy counseling sessions. On his most recent visit to the foster home, on July 6, 2011, Kyla told Mateo that she likes being with Kyle and Karen and that she feels safe and secure with them. Mateo testified that from his observations, Kyla seemed very close to her foster parents.

¶ 72    Mateo further testified that on June 29, 2011, Kyla and Shauntae visited a DOC facility, where they had a video conference with Keisha. Mateo acknowledged that he was a bit late for the conference, but stated that from what he did observe, he noticed that while Shauntae spoke to Keisha, Kyla did not appear very interested in the visit and spent most of her time playing outside the view of the camera. Mateo stated that Shauntae recognizes Keisha and has more of a connection to her than Kyla does. Both girls, however, call Keisha "mom."

¶ 73    Mateo testified that it was his opinion that it would be in both girls' best interests to terminate parental rights and to appoint a guardian with the right to consent to adoption. Mateo explained that Kyle and Karen have always been supportive and cooperative in making the children available for needed services, and that all of the girls' emotional needs were being met in the foster home. Kyle and Karen have been open to having the girls' biological relatives, including Keisha, participate in their lives. Shauntae and Kyla have an ongoing relationship with their maternal grandmother, Debra, and maternal aunt, Frances,

and the foster parents plan on allowing those relationships to continue.

¶ 74    Mateo testified that he was aware that if the parental rights were terminated, the foster parents would have no obligation to provide further visits with Keisha or biological relatives, but stated that this did not change his opinion that it was in the girls' best interests for Keisha's rights to be terminated.

¶ 75    After Mateo's testimony, the court heard from Jorie Cotton, who has been the children's therapist for two years. Cotton testified that Kyla had just successfully terminated her therapy. Cotton explained that Kyla never had a psychiatric diagnosis, but had been receiving play therapy to address attachment issues, including bed-wetting at around the time she would interact with Keisha. Cotton stated that because the children had moved three or four times before being placed with Kyle and Karen, Kyla exhibited fear of having to move again. According to Cotton, Kyla was very attached to Kyle and Karen and did not seem to have any attachment to Keisha.

¶ 76    Cotton next testified about Shauntae, explaining that Shauntae continues to be in individual and play therapy.[22] According to Cotton, Shauntae is very loyal to Keisha and generally "shuts down" when questioned about her mother. Also, during play therapy Shauntae exhibits feelings of guilt about leaving or losing things. Cotton explained, however, that Shauntae is working through these feelings, dealing with attachment issues, and doing well at becoming acclimated to her foster home. Shauntae has a bond with each of her foster parents and her attachment to them is very healthy. Cotton testified that although Shauntae had a relationship with Keisha, she has "come a long way" in becoming attached to her foster parents and it would be detrimental to her to move.

¶ 77    Cotton averred that she has spoken to the foster parents and that they have told her that "they would be okay with [Shauntae] having a relationship with her mother." Cotton has received no indication that the foster parents would prohibit Shauntae from continuing this relationship. Cotton acknowledged that if parental rights were terminated, there would be no obligation on the part of the foster parents to continue contact with Keisha, but stated that even if all contact were terminated, it would, nevertheless, be in the girls' best interests to be adopted by Kyle and Karen. Specifically, with respect to Shauntae, when asked whether it would be detrimental to Shauntae if her relationship with Keisha were severed, Cotton stated:

> "At this point I don't believe so, because contact has been so inconsistent and she is working through that currently. So I don't think it would be that detrimental."

¶ 78    The State next called the minors' foster father, Kyle H. He testified that the girls have been living with him and his wife for two years, since July 1, 2009. He stated that when the girls were initially placed in their home, Shauntae was six and Kyla was five. Kyle and Karen have no other children and no one else lives with them. Kyle testified that they originally thought the placement would be temporary, but the situation evolved and both girls became members of their family.

---

[22]Cotton acknowledged that Shauntae exhibits sexualized behavior but explained that Shauntae is treated by a different therapist for this issue.

¶ 79    Kyle explained that Kyla bonded with them very quickly but that it took Shauntae longer to become bonded and comfortable with them. According to Kyle, while within a month, Kyla called Karen "mom," Shauntae would remind them that she had a mother who was in jail and who was working to get a house. Kyle explained that, with time, things changed and that now Shauntae, like Kyla, is very bonded and comfortable with them and calls them "mom" and "dad." Kyle stated that the girls have bonded not only with him and his wife but also with their extended families and friends.

¶ 80    Kyle stated that he and his wife want to adopt Shauntae and Kyla and are committed to providing for them until adulthood. He believes that it is in the girls' best interest to remain in their home. Kyle acknowledged that Shauntae has special needs related to sexualized behaviors, but felt that the therapy she was currently receiving was helping her.

¶ 81    Kyle further testified that Karen and he have maintained a very close bond with the girls' biological aunt, Frances, who lives just a couple of blocks away. The girls have slept over at Frances' house, and Kyle and Karen have gone out to dinner with her and have invited her over for holidays. Kyle and Karen have also hosted visits with other maternal relatives, including the girls' great-uncle, great-grandfather and cousins.

¶ 82    Kyle stated that the girls have also had some visits with their mother. He testified that he understood that if parental rights were terminated, there would be no legal obligation to allow contact with Keisha. However, Kyle averred that if the relationship with Keisha was in the girls' best interest and the contact remained healthy, he planned to continue it.

¶ 83    After the State rested, Keisha presented the testimony of her mother, Debra. Debra testified that in May 2006 when Keisha and Lonnie were living in Colorado and having problems, Debra picked up Shauntae (who was then two years old) and Kyla (who was an infant) and brought them to her home in Georgia. Debra cared for the girls until August 2006 when Keisha returned the girls to Colorado. By September 2006, Keisha and Lonnie, who had moved to Peoria, Illinois, were having problems again, and Debra moved to Peoria to take care of the girls once again. She did so "for quite a while."

¶ 84    Debra testified that after Keisha was arrested in 2007, in June of that year, she was appointed to be the children's guardian. According to Debra, soon thereafter she began experiencing financial difficulties. Debra could not receive compensation from the State because she was not the children's foster parent, but at the same time, could not receive benefits because she was already their guardian. Debra therefore took the girls to Evanston and moved in with her daughter, Frances, in August 2008. Debra remained the minors' primary caretaker until January 2009. At the end of that month, Debra moved to Phoenix, because a friend offered her a job there. She remained in contact with the girls and remains interested in caring for them.

¶ 85    Debra also testified that the foster parents were "good people" who were doing their best to take care of Shauntae and Kyla.

¶ 86    After all the parties rested, counsel presented closing arguments, and the court took the case under advisement, continuing the matter to August 3, 2011. On August 3, 2011, the court entered orders terminating Keisha's parental rights, specifically finding that the State had proven by clear and convincing evidence that Keisha was unfit pursuant to subsections

1(D)(b), (m), and (i) of the Adoption Act (750 ILCS 50/1(D)(b), (i), (m) (West 2008)). The court also found that it was in the children's best interests to terminate Keisha's parental rights and appoint a guardian with the right to consent to adoption. Keisha now appeals the termination of her parental rights.

¶ 87                                II. ANALYSIS

¶ 88      We begin by noting that the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2008)) provides a two-step, bifurcated process for the involuntary termination of parental rights. *In re C.W.*, 199 Ill. 2d 198, 210 (2002). First, the court holds an "unfitness hearing," during which, the State must prove that the parent is unfit as defined in section 1(D) of the Adoption Act. 750 ILCS 50/1(D) (West 2008); 705 ILCS 405/2-29 (West 2008); see also *In re C.W.*, 199 Ill. 2d at 210. Because the termination of parental rights constitutes a complete severance of the parent-child relationship, proof of parental unfitness must be clear and convincing. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). Only if the court finds the parents to be unfit will the court go on to conduct a "best interests hearing" to determine whether it is in the best interests of the child to terminate the parental rights. 705 ILCS 405/2-29(2) (West 2008); *In re C.W.*, 199 Ill. 2d at 210; *In re D.T.*, 212 Ill. 2d 347, 352-53 (2004).

¶ 89      Although section 1(D) of the Act sets forth numerous grounds under which a parent may be found unfit, any one of the grounds, if proven, is sufficient to enter a finding of unfitness. *In re C.E.*, 406 Ill. App. 3d 97, 107 (2010). Because the circuit court is in the best position to assess the credibility of witnesses, a reviewing court may reverse a circuit court's finding of unfitness only where it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d at 208; see also *In re C.E.*, 406 Ill. App. 3d at 107-08. A decision regarding parental fitness is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the finding is unreasonable, arbitrary, or not based on the evidence. *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000). Each case concerning parental unfitness is *sui generis* and requires a close analysis of its unique facts. *In re C.E.*, 406 Ill. App. 3d at 108.

¶ 90      In the present case, the circuit court found Keisha to be unfit on three separate statutory grounds pursuant to subsections 1(D)(b), (m), and (i) of the Adoption Act (750 ILCS 50/1(D)(b), (m), (i) (West 2008)). We initially consider the court's finding that Keisha was unfit under section 1(D)(b) as articulated by the Act (750 ILCS 50/1(D)(b) (West 2008)). This section of the Act provides that a parent's "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare" is a ground for finding the parent unfit. 750 ILCS 50/1(D)(b) (West 2008). Our courts have repeatedly held that because the language of subsection 1(D)(b) is stated in the disjunctive, any of the three elements on its own can be the basis for an unfitness finding: the failure to maintain a reasonable degree of interest *or* concern *or* responsibility as to the child's welfare. *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004); see also *In re C.E.*, 406 Ill. App. 3d at 108. We recognize, as Keisha points out, that in examining allegations under subsection 1(D)(b), a trial court must focus on the reasonableness of the parent's efforts and not the success of those efforts, and must consider any circumstances that may have made it difficult for her to visit, communicate with or otherwise express interest in her child. *In re Jaron Z.*, 348 Ill. App. 3d at 259; see also *In re*

*C.E.*, 406 Ill. App. 3d at 108. However, our courts have repeatedly held that a parent will not be found fit merely because she has demonstrated some interest in or affection for her child. *In re Jaron Z.*, 348 Ill. App. 3d at 259 (citing *In re E.O.*, 311 Ill. App. 3d 720, 727 (2000)). Rather, her interest, concern and responsibility must be reasonable. *In re Jaron Z.*, 348 Ill. App. 3d at 259 (citing *In re E.O.*, 311 Ill. App. 3d at 727). Evidence of noncompliance with an imposed service plan, a continued addiction to drugs, or infrequent or irregular visitation with the minor all have been held sufficient to support a finding of unfitness under subsection 1(D)(b). See *In re Janira T.*, 368 Ill. App. 3d 883, 893 (2006); see also *In re Jaron Z.*, 348 Ill. App. 3d at 259.

¶ 91    Keisha contends that the circuit court's finding of unfitness on this ground was against the manifest weight of the evidence. She claims that even though DCFS failed to make reasonable efforts to assist her, she participated in "many services," including domestic violence counseling, attending NA/AA meetings, visiting with her daughters, and paying for her own urine analysis. She also claims that she completed a 12-week advanced parenting class, for which DCFS would not give her credit.

¶ 92    Keisha couches her argument in terms of a procedural error. She argues that because she filed her "affirmative defenses" asserting the aforementioned facts, and the State did not file a written reply to those "affirmative defenses," the circuit court was compelled to accept as true her assertions that: (1) DCFS failed to make reasonable efforts to assist her and (2) the agency failed to give her credit for completed services. We disagree.

¶ 93    We initially note that Keisha has forfeited this argument on appeal, by failing to raise it before the trial court. It is well established that an appellant's failure to raise an issue in the circuit court results in waiver of that issue. See, *e.g.*, *Helping Others Maintain Environmental Standards v. Bos*, 406 Ill. App. 3d 669, 695 (2010) ("Generally, a party who does not raise an issue in the trial court forfeits the issue and may not raise it for the first time on appeal."); *In re Marriage of Culp*, 399 Ill. App. 3d 542, 550 (2010); see also *Enterprise Recovery Systems, Inc. v. Salmeron*, 401 Ill. App. 3d 65, 76 (2010); *In re Marriage of Wolff*, 355 Ill. App. 3d 403, 415 (2005) ("Failure to raise the lack of a reply to affirmative defenses in the trial court also results in waiver of that issue on appeal." (citing *Andrews v. Cramer*, 256 Ill. App. 3d 766, 769 (1993))). The record before us reveals that Keisha never asked the circuit court below to take the assertions made in her "affirmative defenses" as true. Nor did she argue to the circuit court that the State's failure to respond to these "affirmative defenses" constituted an admission of the facts asserted therein, compelling the court to accept those assertions as facially true.

¶ 94    Second, the State's failure to file a reply to her "affirmative defenses" does not mean the circuit court was required to accept those "affirmative defenses" as true. Keisha cites to no authority that would support the allegation that DCFS's failure to make a reasonable effort to provide her services or to accept her completed classes constitutes an "affirmative defense" to a termination petition. And although her pleading was entitled "Affirmative Defenses," it is well accepted that " '[t]he nature of a [pleading] is determined by its substance rather than its caption.' " *Shutkas Electric, Inc. v. Ford Motor Co.*, 366 Ill. App. 3d 76, 81 (2006) (quoting *J.D. Marshall International, Inc. v. First National Bank of Chicago*, 272 Ill. App. 3d 883, 888 (1995)). Here, instead of raising affirmative defenses,

-20-

Keisha simply raised factual allegations for purposes of denying the State's assertion that she was unfit to be a parent. Therefore, her "affirmative defenses" simply raised issues that would be litigated at the hearing on the termination petitions, and we cannot say that the State's failure to respond to these "affirmative defenses" compelled the trial court to accept them as true.

¶ 95    What is more, the record below reveals that the issues raised by Keisha's "affirmative defenses" were actually litigated before the circuit court during the unfitness hearing. "Litigating the issues raised by an affirmative defense waives any objection to the failure to file a reply." *In re Marriage of Wolff*, 355 Ill. App. 3d at 415; see also *H&H Press, Inc. v. Axelrod*, 265 Ill. App. 3d 670, 677 (1994) ("It is established that where a defendant introduces evidence to support an affirmative defense, he is deemed to have waived a reply."); *State Farm Mutual Automobile Insurance Co. v. Haskins*, 215 Ill. App. 3d 242, 246 (1991) (holding that the defendants "waived any objection to the failure to file a reply to the affirmative defense by introducing evidence in support of the allegations contained in the affirmative defense and fully litigating the issues raised by the affirmative defense").

¶ 96    According to the transcript of proceedings, during the unfitness hearing Keisha presented testimony and arguments on each of her "affirmative defenses." She testified that she initially had no DCFS caseworker to refer her to services, noting that when she initially met with caseworker Chamblin, Chamblin merely gave her the DCFS service plan but then told her she would not be her caseworker and could not refer her to services. Contrary to Keisha's testimony, Chamblin testified that between August 2008 and March 2009, she visited Keisha at the work-release program on more than one occasion and discussed with her what services DCFS was recommending. Chamblin stated that she gave Keisha the DCFS service plan and discussed with her what services she might be able to obtain while in the work-release program. In her own testimony, Keisha acknowledged that she worked with her work-release counselor, Puckett, to participate in services outside of the services provided by DCFS. Puckett testified to the services Keisha engaged in while in the work-release program. In closing argument, Keisha's counsel argued that Keisha was not provided with the necessary services and that for a time she did not have a caseworker and did not know what services she was supposed to engage in. The circuit court weighed the credibility of the witnesses and determined that Keisha had been provided sufficient opportunity to engage in services but failed to follow through with her commitments. Under this record, it is apparent that Keisha fully litigated the question of whether DCFS made reasonable efforts to assist her and that the circuit court resolved this issue in favor of the State. Accordingly, Keisha has forfeited any claim related to the lack of reply by the State and cannot now argue that the circuit court was compelled to accept this "affirmative defense" as true. See, *e.g.*, *In re Marriage of Wolff*, 355 Ill. App. 3d at 415; *H&H Press*, 265 Ill. App. 3d at 677; *State Farm Mutual Automobile Insurance Co.*, 215 Ill. App. 3d at 246.

¶ 97    The issue of whether DCFS refused to give Keisha credit for services she completed was also fully litigated before the circuit court. The record reveals that Keisha testified that DCFS asked her to complete parenting classes and a mental health evaluation even though she had already engaged in these services while incarcerated. Additionally, Puckett, Keisha's counselor at the work-release program, testified that to enter that program Keisha was

required to undergo a mental health evaluation. He also testified, however, that his summaries of Keisha's counseling sessions while in that program revealed that Keisha continued to exhibit attitude problems, an inability to listen to instructions and to see any situation from another person's point of view. Several witnesses also testified that Keisha failed to remain in the work-release program and was returned to the DOC for the last 45 days of her sentence. Several caseworkers also testified that it was DCFS's policy that classes obtained through DCFS referrals were more thorough than those available through the DOC and that DCFS did not consider the DOC classes Keisha took to be sufficient. At the close of the unfitness hearing, Keisha's counsel argued that Keisha had completed a mental health assessment, since she could not have participated in the work-release program otherwise, and that there was at least some evidence (*i.e.*, Keisha's testimony) that she had taken a parenting class while incarcerated.[23] Counsel argued that DCFS should have taken notice of both completed services. The circuit court was apparently not persuaded by counsel's argument and instead found that although there was evidence that Keisha participated in some services while either in jail or in the work-release program, overall there were a number of periods of time when she failed to make any such efforts. Accordingly, Keisha has fully litigated the issue of whether DCFS failed to credit her for classes she completed while in the DOC and she cannot now contend that the lack of reply by the State on this issue compelled the circuit court to accept this "affirmative defense" as true. See, *e.g.*, *In re Marriage of Wolff*, 355 Ill. App. 3d at 415; *H&H Press*, 265 Ill. App. 3d at 677; *State Farm Mutual Automobile Insurance Co.*, 215 Ill. App. 3d at 246.

¶ 98    Moreover, even if we were to accept the factual assertions made by Keisha in her "affirmative defenses" as true, the record below, nevertheless, overwhelmingly supports the circuit court's finding that Keisha was unfit to be a parent on the basis of her failure to "maintain a reasonable degree of interest, concern or responsibility" as to her children's welfare. 750 ILCS 50/1(D)(b) (West 2008).

¶ 99    The evidence presented at the unfitness hearing establishes that while Keisha did visit her daughters, these visits were inconsistent and Keisha's behavior and choices made visitation difficult or impossible. The record reveals that in November 2008, shortly after the minors were adjudicated neglected and dependant, Keisha was found to have committed "unauthorized movement" in her work-release program and was returned to the Dwight Correctional Center, eliminating her weekend passes from the work-release program, and her ability to visit her daughters at Frances' home in Evanston. Although after being released from the DOC in January 2009, Keisha resumed her visits with the children, Mateo testified that these visits were at best "sporadic." Moreover, Keisha often engaged in inappropriate behavior during these visits, exhibiting her lack of concern or responsibility for her daughters. For example, Keisha continued to bring unauthorized individuals to the visits,

---

[23]Keisha also argues on appeal that the circuit court erred when it refused to admit the parenting class certificate into the record. We need not address this contention, however, since, as shall be more fully demonstrated below, we conclude that even with the admission of the parenting class certificate, the evidence would have overwhelmingly supported the conclusion that Keisha was unfit to be a parent.

despite being told that this was inappropriate. Keisha also continued to make false promises about reunification to her children, exhibiting her inability to put her daughters' needs ahead of her own. What is more, in January 2010, Keisha chose to move to Colorado, miles away from her children, where "visits" could be made only through a web camera. By the time Keisha's case reached the hearing on the State's termination petitions, Keisha had not seen her daughters in person for over a year.

¶ 100   The record further establishes that although Keisha admitted to having been provided with the DCFS service plan, listing the recommended services that she needed to undertake in order to be able to reunite with her children (including mandatory substance abuse counseling) after being released from the DOC in January 2009, she continued to abuse drugs. Berry testified that on November 5, 2009, nearly a year after the October 2008 adjudication of neglect and dependency, Keisha tested positive for cocaine and marijuana. Mateo testified that in January 2010, Keisha admitted to still using marijuana. The record reveals that although after her relapse, Keisha was recommended for an inpatient treatment program to help with her substance abuse problem, and transportation to the program was provided by DCFS, Keisha canceled the initial evaluation appointment at the last minute and then stopped contacting the caseworker altogether. When the caseworker finally reached her by telephone, Keisha told her that she had moved to Colorado.

¶ 101   As the circuit court noted in its unfitness findings, Keisha's lack of responsibility for her daughters is further evident in her repeated incarceration. Keisha was already incarcerated in October 2008, when the adjudication orders for her two daughters were entered, and the circuit court warned her that she could risk termination of her parental rights if she did not comply with DCFS's recommendations. Nevertheless, Keisha failed to abide by the rules of the work-release program and was returned to the DOC to finish her sentence there. In addition, after her parole in January 2009, Keisha succeeded in getting arrested and imprisoned twice more: (1) first, on June 30, 2010, when she was sentenced by a Colorado court to 90 days in jail for her outstanding warrants (*i.e.*, "driving under false information"); and (2) second, on November 10, 2010, when she was transported back to Kane and then Decatur County jail to serve time for a conviction of forgery. Keisha remained in jail (at the Dwight Correctional Center) when the hearing on the termination petitions was held.

¶ 102   Under these circumstances, we conclude that the circuit court's finding that Keisha was unfit on the basis of her failure to maintain a reasonable degree of responsibility for her children was not against the manifest weight of the evidence. See *In re Jaron Z.*, 348 Ill. App. 3d at 259 ("Noncompliance with an imposed service plan, a continued addiction to drugs, repeated failure to obtain treatment for an addiction, and infrequent or irregular visitation with the child have all been held to be sufficient evidence warranting a finding of unfitness under subsection (b)."); see also, *e.g.*, *In re Konstantinos H.*, 387 Ill. App. 3d 192, 204 (2008) (affirming the circuit court's finding of unfitness under ground (b), where, despite some evidence of the welfare agencies' indifference and inadequate delivery of services, mother, who was informed by the caseworker that she was required to submit urine samples, attend meetings, have a psychological assessment, complete parenting classes, and visit regularly with child, failed to do so).

¶ 103   The circuit court also found respondent unfit under subsections 1(D)(i) and (m), and

-23-

Keisha claims that both of those findings are against the manifest weight of the evidence. However, we need not consider these claims given that any of the three grounds under which the circuit court found Keisha to be unfit are sufficient to affirm the circuit court's judgment and given our conclusion that the court's unfitness finding pursuant to subsection 1(D)(b) was not against the manifest weight of the evidence. See *In re Janira T.*, 368 Ill. App. 3d at 893-94.

¶ 104　　Keisha next contends that the circuit court's determination that it was in the minors' best interests to terminate her parental rights was against the manifest weight of the evidence. Keisha argues that it is in the children's best interest that they be placed with their maternal grandmother, Debra. We begin by noting that Keisha did not challenge the circuit court's best interests determination in her original brief before this court. Rather, she solely contested the circuit court's finding that she was unfit to be a parent. Only after the State responded to her brief did Keisha raise the best interests issue for the first time in her reply brief. This is a violation of Illinois Supreme Court Rule 341(h)(7), which provides that " '[p]oints not argued [in the appellant's brief] are waived and shall not be raised in the reply brief.' " *People v. Borello*, 389 Ill. App. 3d 985, 998 (2009) (quoting Ill. S. Ct. R. 341(h)(7) (eff. Sept. 1, 2006)). Since Keisha did not challenge the best interests determination in her original brief, but raised it for the first time in her reply brief, this issue is waived and not properly before this court. See *Byrd v. Hamer*, 408 Ill. App. 3d 467, 487 (2011).

¶ 105　　Nevertheless, even if we were to consider Keisha's argument, for the reasons that follow, we would conclude that the trial court's finding that it was in the best interest of both minors that Keisha's parental rights be terminated was not against the manifest weight of the evidence.

¶ 106　　Once a trial court finds a parent unfit under one of the grounds of section 1(D) of the Adoption Act, the next step in an involuntary termination proceeding requires the court to consider whether it is in the best interests of the child to terminate parental rights, pursuant to section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2008)). *In re Deandre D.*, 405 Ill. App. 3d 945, 953 (2010). The State has the burden of proving by a preponderance of the evidence that termination is in the child's best interests. *In re Deandre D.*, 405 Ill. App. 3d at 953. The court's determination in this respect lies within its sound discretion, especially when it considers the credibility of testimony presented at the best interests hearing; that determination will not be reversed unless it is against the manifest weight of the evidence or the trial court has abused its discretion. *In re Deandre D.*, 405 Ill. App. 3d at 953.

¶ 107　　The Juvenile Court Act provides:

"Whenever a 'best interest' determination is required, the following factors shall be considered in the context of the child's age and developmental needs:

　　(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

　　(b) the development of the child's identity;

　　(c) the child's background and ties, including familial, cultural, and religious;

　　(d) the child's sense of attachments, including:

-24-

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2008).

¶ 108    In the present case, the evidence presented at the best interest hearing overwhelmingly supports the conclusion that the aforementioned statutory factors weigh strongly in favor of terminating Keisha's parental rights and placing the minors for adoption by the current foster parents, Kyle and Karen. The record reveals that of Kyla's five years of life, she has spent only seven months in Keisha's care. Similarly, of Shauntae's six years of life, she has spent only about two years in her mother's care. Beginning in May 2006, and until July 1, 2009, when they were placed in their current foster home, the children have been moved three or four times, shuffling between relatives, namely their grandmother, Debra, and aunt, Frances. The record further establishes that both girls have been living with the current foster parents for two years. The foster parents have ensured that both girls attend their therapy sessions to cope with their custody status (and sexualized behavior for Shauntae), and have expressed a desire to adopt them. The children's therapist and the DCFS caseworker both testified that the children have a healthy attachment to their foster parents, that they feel safe in their environment, and that they call Kyle and Karen "mommy" and "daddy." While Shauntae continues to exhibit some attachment and loyalty to Keisha, Kyla exhibits no attachment or interest in her biological mother. According to the children's therapist, moving the children again would be detrimental to their well-being.

¶ 109    The record further reveals that the foster parents have consistently maintained visitation between the children and their mother. In addition, they have encouraged the children to maintain relationships with their extended biological family. In fact, the foster parents have a very close bond with the children's maternal aunt, Frances, who is a neighbor. The children have been permitted to sleep over at their aunt's house and the foster parents have taken the aunt out to dinner and invited her over for holidays. The foster parents have also hosted visits with other biological maternal relatives, including the girls' great-uncle, great-grandfather and cousins. The foster parents testified that they intend to foster the children's relationship with their biological relatives. They also intend to maintain the children's relationship with

Keisha, as long as that relationship remains healthy and in the children's best interests.

¶ 110　　On the other hand, Keisha presented little evidence during the best interests hearing that the statutory factors lay in her favor. She produced no professional or expert testimony to rebut that of the therapist and case workers, all of whom strongly recommended termination, even in light of a possibility that upon adoption the foster parents would discontinue any relationship with Keisha. Rather, the only witness Keisha introduced on her own behalf was her mother, Debra, who testified that she cared for the children in the past and would like to become their foster parent. The record also reveals, however, that Debra relinquished her guardianship of the children and placed them into the custody of the State because she was unable to care for them. The record also reveals that she moved to Arizona for a job opportunity. In addition, Debra acknowledged in her testimony that the current foster parents are "good people" who are trying to do the best that they can for her granddaughters.

¶ 111　　Based upon this record, we cannot find any error with the circuit court's finding that termination of Keisha's parental rights was in the best interests of Shauntae and Kyla. See *In re Jaron Z.*, 348 Ill. App. 3d at 263-64.


¶ 112　　　　　　　　　　　　　　　III. CONCLUSION

¶ 113　　Accordingly, for all of the aforementioned reasons, we affirm the judgment of the circuit court.


¶ 114　　Affirmed.