2025 IL App (4th) 250259

NO. 4-25-0259

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 30, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* B.F., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Knox County |
| Petitioner-Appellee, | ) | No. 23JA22 |
| v. | ) | |
| Terrance J., | ) | Honorable |
| Respondent-Appellant). | ) | Curtis S. Lane, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court, with opinion.
Justices Steigmann and Cavanagh concurred in the judgment and opinion.

**OPINION**

¶ 1        In August 2024, the State filed a petition to terminate the parental rights of respondent, Terrance J., to his minor child, B.F. (born April 2019). Following the fitness and best-interest hearings, the trial court granted the State's petition and terminated respondent's parental rights. (Destiny D., the minor's mother, died in January 2024.) On appeal, respondent argues (1) the court's findings of unfitness based on respondent's failure to make reasonable efforts to correct the conditions which led to B.F.'s removal and respondent's failure to make reasonable progress toward the return of B.F. to respondent's care are void because the court lacked personal jurisdiction at the adjudicatory and dispositional phases of the proceedings; (2) the court's finding of unfitness based on respondent's failure to maintain a reasonable degree of interest, concern, or responsibility was against the manifest weight of the evidence; and (3) the court erred in denying respondent's requests to continue the fitness and best-interest hearings. We vacate and remand.

¶ 2                                    I. BACKGROUND

¶ 3        On March 29, 2023, the State filed a petition for adjudication of wardship, alleging

B.F. was an abused and neglected minor pursuant to section 2-3 of the Juvenile Court Act of 1987

(Juvenile Court Act) (705 ILCS 405/2-3 (West 2022)). The petition alleged B.F. was found

wandering around HyVee alone on March 16, 2023. B.F. told investigators "no adults were with

her [at HyVee] *** and her aunt was babysitting." B.F.'s aunt confirmed she was watching B.F.

and "B[.F.] was supposed to go to a neighbor's house." The aunt did not confirm B.F. arrived at

the neighbor's house and instead went to sleep after B.F. left. The petition further alleged a hotline

report was made on March 28, stating H.F., B.F.'s sibling, came to school with "purple marks on

her face, arms, neck, back, and legs." H.F. told investigators with the Department of Children and

Family Services (DCFS) that Destiny "hit her with a belt due to poor behavior at school" and

Destiny also hit B.F. with a shoe because B.F. went to HyVee by herself. B.F. later corroborated

H.F.'s statements.

¶ 4        At the initial shelter care hearing, Destiny appeared and advised the trial court

respondent was in prison; however, she did not know which facility housed respondent. Following

evidence and argument, the court found there was probable cause for the State's petition and

granted temporary custody and guardianship of B.F. to DCFS. The court continued the case for a

temporary custody renewal hearing pursuant to section 2-10(3) of the Juvenile Court Act to allow

the State to provide notice to respondent. *Id.* § 2-10(3).

¶ 5        The trial court held multiple temporary custody renewal hearings, which

respondent did not attend. The record shows multiple summonses issued to respondent at a

Galesburg, Illinois, address were returned as undeliverable. At a temporary custody renewal

hearing on April 20, 2023, the State requested the court's permission to serve respondent by

publication pursuant to section 2-16 of the Juvenile Court Act. *Id.* § 2-16. In support of its request, the State filed a notarized "Affidavit of Diligent Search," which stated:

> "1. The putative father, [respondent], of the minor [B.F.], Knox County Case Number 2023JA22, last known address of \*\*\*, Galesburg, IL.
>
> 2. The Knox County Sheriff's office tried to execute service on the putative father, [respondent], summons, on or about April 12, 2023 and April 14, 2023, with no service made stating there was no answer at the door.
>
> 3. It is believed that the father named above resides or has gone out of this State, or is concealed within this State, such that process cannot be served upon him."

The court granted the State's request for service by publication. Subsequently, the State filed "Certificates of Mailing Notice by Publication" on April 27 and May 4, 2023. At another temporary custody renewal hearing on May 4, the State advised the court service by publication was complete and requested the court enter a default judgment against respondent. The court granted the State's request and stated, "[Respondent] will be defaulted on the petition."

¶ 6 At the adjudicatory hearing on July 25, 2023, Destiny stipulated to count II of the State's petition. The trial court accepted Destiny's stipulation, entered a default judgment against respondent, and found B.F. was an abused and neglected minor as alleged in the State's petition. The court's written order stated, with respect to respondent, "The respondent father has been notified by publication. \*\*\* Those respondents who have been served with summons or by publication and have not entered an appearance are in default."

¶ 7 The trial court held a dispositional hearing on November 28, 2023. When the court noted appearances for the record, it stated, "The father of [B.F.] is believed to be, I believe,

- 3 -

[respondent.] I believe, according to the report, he's in a [correctional] facility." Dispositional reports from the Center for Youth and Family Solutions (CYFS) and Court Appointed Special Advocates (CASA) were admitted without objection. The CASA report listed respondent's address as United States Penitentiary (USP), Victorville, and the CYFS report stated respondent is "currently detained in the California Department of Corrections." After hearing evidence and arguments from the parties, the court found respondent was "unfit to care for, protect, train, educate, supervise, or discipline [B.F.] and placement with h[im] is contrary to the health, safety and best interest of [B.F.]," and it ordered custody and guardianship of B.F. to remain with DCFS. The court ordered respondent submit to DNA testing to confirm paternity.

¶ 8        At a permanency review hearing on February 27, 2024, the trial court provided a brief update on the case:

"The mother, unfortunately, has passed away. *** The, I guess, putative dad to [B.F.], because we still don't have DNA testing—which again is nobody's fault— he apparently is in federal custody *** in the state of California. So we have not been able to engage in the DNA testing. I'm going to go ahead and appoint him an attorney *** pending whatever the results of the DNA are."

The court then continued the case for another permanency review hearing in six months.

¶ 9        On August 27, 2024, the State filed a petition to terminate respondent's parental rights. The petition alleged:

"That the father of the minor, [respondent], and all known and unknown fathers, is an unfit person as described in the Adoption Act, 750 ILCS 50/1D and 705 ILCS 405/2-29 in that:

a. He has failed to make reasonable efforts to correct the conditions

- 4 -

which were the basis for removal of the minor from parental custody within 9 months of an adjudication of neglect being July 26, 2023 to April 26, 2024. [Citation.]

b. He has failed to make reasonable progress toward the return of the minor to parental custody within 9 months of an adjudication of neglect being July 26, 2023 to April 26, 2024. [Citation.]

c. He has failed to maintain a reasonable degree of interest, concern or responsibility as to the minor's welfare."

The State sent a summons to respondent at USP, Pollock. The service return indicates the summons was served on September 17, 2024. (We note the record does not indicate when respondent was transferred from USP, Victorville to USP, Pollock.)

¶ 10 The first appearance on the State's petition to terminate respondent's parental rights was held on September 17, 2024. Respondent appeared via telephone, and respondent's counsel appeared in person. The trial court advised the parties DNA was collected from respondent and B.F. but the paternity results had not been received. Respondent acknowledged he received a copy of the State's petition that day, and the court then admonished him as to his rights. After admonishing respondent, the court inquired whether the agency "ha[d] contact or attempted contact with [respondent]" after he was identified as the putative father at the beginning of the case. The caseworker responded, "We weren't ever able to establish contact. He was in California at a higher security facility, and our attempts were never responded to." Neither the court nor the parties inquired whether respondent received any attempted communication from the agency. The court confirmed respondent was currently incarcerated in a federal prison in Louisiana and remarked, "I'm surprised they would even allow for a phone call then." After this discussion, the

court informed respondent, "[I]f you are dad, then we'll set up a telephone call or whatever the facility allows for the [fitness hearing] date."

¶ 11 The fitness hearing occurred on November 12, 2024, and the best-interest hearing occurred on February 25, 2025. Because respondent's arguments on appeal do not relate to the trial court's best-interest determination, we discuss only those facts necessary to understand respondent's contentions on appeal.

¶ 12                                   A. Fitness Hearing

¶ 13 Before the fitness hearing began, the trial court noted respondent was not present, even though the State faxed a video writ to "the proper fax number to USP Pollock." The court indicated it had a fax confirmation sheet, which showed the video writ was faxed to USP Pollock on October 21, 2024. (We note the court stated it was "going to put this all in the file" when discussing the fax confirmation. However, no fax confirmation sheet appears in the record.) Respondent's counsel informed the court he spoke with a staff member at USP, Pollock, who advised "they did not have a fax number." The staff member told respondent's counsel "they never received the video writ [but] they would attempt to get in touch with the unit captain to see if they could make some magic happen and get [respondent] on the phone." However, 10 minutes later, respondent was still not on the phone. Respondent's counsel requested a continuance to allow respondent to attend the hearing. The State objected to the continuance and requested the court enter a default judgment against respondent. The court denied the State's request to find respondent in default and denied respondent's counsel's request for a continuance.

¶ 14 The State requested the trial court "take judicial notice of *** all of the case service plans, integrated assessments, permanency review reports, CASA reports, dispositional hearing report, and the stipulation of the mother." The court informed the parties it would not take judicial

notice of any of its prior findings but would take judicial notice of the contents of all the reports and the stipulation of the mother.

¶ 15          1. *Testimony of Sharayah Snyder*

¶ 16          Sharayah Snyder was the caseworker on B.F.'s case from April 2023 to November 2023 and from March 2024 to present. B.F. came into care after her mother, Destiny, admitted to using physical abuse as punishment. Respondent, B.F.'s father, was incarcerated in federal prison until December 15, 2034. During her time as caseworker, she was never in contact with respondent. Respondent never reached out to Snyder, either by letter or e-mail, to inquire about B.F.

¶ 17          Due to the lack of contact, respondent never completed an integrated assessment, and consequently, no services were recommended for him. Snyder did not know whether respondent completed any services while incarcerated but indicated she never received proof of completion for any services. In Snyder's opinion, respondent failed to make reasonable efforts to correct the conditions which led to B.F.'s removal during the nine-month period from July 2023 to April 2024. When asked if respondent was involved in B.F.'s life, Snyder acknowledged respondent "had phone contact with [B.F.]" but did not know whether he wrote B.F. any letters.

¶ 18          On cross-examination by the guardian *ad litem*, Snyder agreed respondent was "unable to participate in a meaningful way because he's incarcerated." Additionally, Snyder reiterated respondent never inquired about completing services while incarcerated.

¶ 19          On cross-examination by respondent's counsel, Snyder acknowledged she never had any contact with respondent. She did have contact with respondent's "unit team" at the prison, but not respondent. Snyder agreed respondent was incarcerated throughout the pendency of the case.

¶ 20     Following Snyder's testimony, the State advised the trial court it did not have any further witnesses or evidence.

¶ 21                              2. *Testimony of Natalie S.*

¶ 22     Respondent's counsel called Natalie S., B.F.'s foster mother, as a witness. Natalie advised respondent contacted her about B.F. "occasionally when he's able to" by phone. When respondent called, he asked about B.F., and Natalie would provide him with updates. According to Natalie, respondent's phone calls were irregular and "broken up" due to prison security and respondent's transfer between prisons. When asked to estimate the last time she spoke with respondent, Natalie indicated "[i]t's been a couple weeks" because "he's been in the hole." Respondent had more regular contact with B.F. when he was incarcerated in the Knox County jail a few years ago; however, when respondent went to the Federal Bureau of Prisons, his contact became irregular.

¶ 23     On cross-examination by the State, Natalie agreed respondent never sent any gifts or cards for B.F. Additionally, Natalie advised she "told [respondent] when [she] spoke to him when the case began that he needed to reach out to CYFS and to handle or have his mom *** handle it for him."

¶ 24                              3. *Trial Court's Ruling*

¶ 25     Following argument by the parties, the trial court found the State had proven by clear and convincing evidence respondent was unfit as alleged in the State's petition to terminate parental rights. In announcing its ruling, the court stated:

> "[T]here was no evidence to rebut the testimony of Ms. Snyder. There is no
> evidence to rebut that the phone calls to [Natalie] for [B.F.] was [*sic*] few and far
> between and she said a few years ago basically was more consistent when he was

in the Knox County Jail. It appears that he has been, I would say, 90 plus percentage of throughout the life of this case incarcerated and unable to participate in any services including probably—I don't have any testimony about video visits. I don't have testimony about him requesting foster mom to talk to her or to set up videos because—or to set up in-person visits and that really—there was no testimony of really any contact whatsoever that's consistent at all."

The court then continued the case for a best-interest hearing.

¶ 26                            B. Best-Interest Hearing

¶ 27        The best-interest hearing was initially set for December 12, 2024. On that date, respondent appeared by telephone, and respondent's counsel appeared in person. Respondent's counsel requested a continuance because respondent was unaware of the best-interest hearing due to his nonappearance at the fitness hearing. Moreover, respondent requested counsel obtain a copy of the transcript from the fitness hearing so respondent could review it prior to the best-interest hearing. The State objected to the continuance, and the trial court continued the best-interest hearing to February 25, 2024, over the State's objection.

¶ 28        On February 25, 2024, respondent did not appear, but respondent's counsel appeared in person. Respondent's counsel requested a continuance and advised the trial court respondent was "being transferred from his previous federal institution in Louisiana and was just put on a plane earlier this morning." There were no objections to the request; however, the court denied the request and reasoned there was no guarantee respondent would appear at any future date based on his incarceration, as the prison received notice of the hearing and respondent still did not appear. Following evidence and argument, the court found termination of respondent's parental rights was in B.F.'s best interest. This appeal followed.

¶ 29                                    II. ANALYSIS

¶ 30          On appeal, respondent argues (1) the trial court's findings of unfitness based on respondent's failure to make reasonable efforts to correct the conditions which led to B.F.'s removal and respondent's failure to make reasonable progress toward the return of B.F. to his care are void because the court lacked personal jurisdiction at the adjudicatory and dispositional phases of the proceedings; (2) the court's finding of unfitness based on respondent's failure to maintain a reasonable degree of interest, concern, or responsibility was against the manifest weight of the evidence; and (3) the court erred in denying respondent's requests to continue the fitness and best-interest hearings.

¶ 31                              A. Personal Jurisdiction

¶ 32          "Jurisdiction is most commonly understood as consisting of two elements: subject matter jurisdiction and personal jurisdiction." *People v. Castleberry*, 2015 IL 116916, ¶ 12. "Subject matter jurisdiction refers to the court's power to hear and determine cases of the general class to which the proceeding in question belongs." (Internal quotation marks omitted.) *In re M.W.*, 232 Ill. 2d 408, 415 (2009). "Personal jurisdiction refers to the court's power to bring a person into its adjudicative process." (Internal quotation marks omitted.) *Castleberry*, 2015 IL 116916, ¶ 12. "The absence or presence of jurisdiction is a purely legal question, and our review therefore is *de novo*." *In re Luis R.*, 239 Ill. 2d 295, 299 (2010).

¶ 33          "A respondent *** may consent to personal jurisdiction by his appearance, or he may have personal jurisdiction imposed upon him by effective service of summons." *M.W.*, 232 Ill. 2d at 426. Pursuant to section 2-15 of the Juvenile Court Act, "[w]hen a petition is filed, the clerk of the court shall issue a summons with a copy of the petition attached. The summons shall be directed *** to each person named as a respondent in the petition." 705 ILCS 405/2-15(1) (West

2022). Proper methods of personal service include leaving a copy of the summons and petition (1) with the person summoned, (2) at the summoned person's abode under certain circumstances, or (3) with the parent or guardian of a minor. *Id.* § 2-15(5). "When personal service under section 2-15 cannot be accomplished, the [Juvenile Court] Act provides two other mechanisms for service of summons." *In re Dar. C.*, 2011 IL 111083, ¶ 63. First, under section 2-16(1), service can be made by certified mail "[i]f service *** as provided in Section 2-15 is not made on any respondent within a reasonable time or if it appears that any respondent resides outside the State." 705 ILCS 405/2-16(1) (West 2022). Second, if service cannot be effectuated by the foregoing methods, as a last resort, section 2-16(2) of the Juvenile Court Act authorizes service by publication. Section 2-16(2) states, in pertinent part:

> "Where a respondent's usual place of abode is not known, a diligent inquiry shall be made to ascertain the respondent's current and last known address. [DCFS] shall adopt rules defining the requirements for conducting a diligent search to locate parents of minors in the custody of the Department. If, after diligent inquiry made at any time within the preceding 12 months, the usual place of abode cannot be reasonably ascertained, or if respondent is concealing his or her whereabouts to avoid service of process, petitioner's attorney shall file an affidavit at the office of the clerk of court in which the action is pending showing that respondent on due inquiry cannot be found or is concealing his or her whereabouts so that process cannot be served. The affidavit shall state the last known address of the respondent. The affidavit shall also state what efforts were made to effectuate service." *Id.* § 2-16(2).

¶ 34 In this case, the State attempted to serve respondent via publication prior to the entry of the adjudicatory and dispositional orders. However, as the State concedes in its brief, service by publication was not effective on respondent because "there was not a diligent inquiry to ascertain the respondent's current and last known location before the initial service via publication." We accept the State's concession and agree the record demonstrates the State failed to perform a diligent inquiry prior to attempting to effectuate service on respondent by publication. Therefore, service by publication was not effectuated on respondent, and the trial court lacked personal jurisdiction when it entered the adjudicatory and dispositional orders. See *In re Dar. C.*, 2011 IL 111083, ¶ 85 ("Because the requisite diligent inquiry was not performed, the State's service by publication was defective and did not confer personal jurisdiction to the trial court, rendering its judgment void.").

¶ 35 Despite its concession regarding the lack of service on respondent, the State asserts respondent forfeited his argument the trial court lacked personal jurisdiction when the adjudicatory and dispositional orders were entered because "he appeared before the trial court, was provided a copy of the petition, and did not object to the court's personal jurisdiction." Alternatively, the State contends respondent's argument is barred by the doctrine of *laches*.

¶ 36                                    1. *Forfeiture*

¶ 37 The State asserts respondent has forfeited his argument the trial court lacked personal jurisdiction when it entered the adjudicatory and dispositional orders by failing to object when he appeared before the court on September 17, 2024.

¶ 38 "If a court lacks either subject matter jurisdiction over the matter or personal jurisdiction over the parties, any order entered in the matter is void *ab initio* and, thus, may be attacked at any time." *M.W.*, 232 Ill. 2d at 414. As our supreme court has held, "[v]oid judgments

- 12 -

occupy a 'unique place' in our legal system. (Internal quotation marks omitted.) [Citation.] When we say that a judgment is void, that judgment may be challenged 'at any time, either directly or collaterally, and the challenge is not subject to forfeiture or other procedural restraints.' " *People v. Price*, 2016 IL 118613, ¶ 30 (quoting *Castleberry*, 2015 IL 116916, ¶ 15).

¶ 39 Here, the State's failure to effectuate proper service on respondent resulted in the trial court lacking personal jurisdiction when the adjudicatory and dispositional orders were entered. Because the court lacked jurisdiction at the time those orders were entered, those orders are void *ab initio*, and forfeiture cannot defeat respondent's challenge to them.

¶ 40 Moreover, to the extent the State attempts to argue respondent's appearance on September 17, 2024, vested the trial court with personal jurisdiction and, consequently, the adjudicatory and dispositional orders became valid at that time, we find this argument meritless. Although it is undisputed respondent appeared by telephone at the September 17 hearing and waived summons and submitted himself to the court's personal jurisdiction at that time by not objecting to the court's personal jurisdiction, this submission and waiver was prospective only, not retroactive. See *Municipal Trust & Savings Bank v. Moriarty*, 2021 IL 126290, ¶ 25 (holding, although a party's appearance waived any objection to the court's personal jurisdiction, "his appearance did not retroactively validate void orders entered prior to [his appearance]"); see also *BAC Home Loans Servicing, LP v. Mitchell*, 2014 IL 116311, ¶ 44 ("[D]efendant waived objections to the circuit court's personal jurisdiction prospectively only ***. The waiver did not serve to validate retroactively the void orders entered prior to defendant's submission to the court's jurisdiction."). Consequently, the adjudicatory and dispositional orders remained void *ab initio* for lack of personal jurisdiction, despite respondent's appearance before the court on September 17.

¶ 41                                              2. *Laches*

¶ 42 In the alternative, the State contends respondent's argument is barred by *laches*. "*Laches* is an equitable defense that serves to bar a party's request for relief when that party unreasonably delayed seeking that relief and that delay prejudiced the rights of the other party." *In re Harmony B.*, 2024 IL App (5th) 231059-U, ¶ 47. Multiple districts of the Illinois Appellate Court, including the Fourth District, have held " ' "[t]he *laches* doctrine may be invoked to preclude the assertion of parental rights." ' " *In re A.S.*, 2023 IL App (4th) 230223-U, ¶ 34 (quoting *In re Jamari R.*, 2017 IL App (1st) 160850, ¶ 53, quoting *In re Adoption of Miller*, 106 Ill. App. 3d 1025, 1030 (1982)). "There are two fundamental elements of *laches*: (1) 'lack of due diligence by the party asserting the claim' and (2) 'prejudice to the opposing party.' " *Tillman v. Pritzker*, 2021 IL 126387, ¶ 25 (quoting *Van Milligan v. Board of Fire & Police Commissioners of the Village of Glenview*, 158 Ill. 2d 85, 89 (1994)). These elements must be proven by the party asserting the *laches* doctrine. *Ashley v. Pierson*, 339 Ill. App. 3d 733, 739 (2003). "The determination of whether *laches* applies depends on the facts and circumstances of each case." *People ex rel. Alvarez v. Gaughan*, 2016 IL 120110, ¶ 14.

¶ 43 In this case, the record demonstrates there was no lack of due diligence by respondent in asserting his challenge to the trial court's lack of personal jurisdiction. The State, in support of its argument *laches* should apply, relies on *Jamari R.* However, that case is easily distinguishable from the present case. In *Jamari R.*, the First District found the respondent's filing of a notice of appeal (which the court construed as the first assertion of respondent's challenge to the trial court's jurisdiction) almost two years after the respondent's first appearance before the trial court constituted a lack of due diligence by the respondent. *Jamari R.*, 2017 IL App (1st) 160850, ¶ 60. Conversely, in this case, respondent's first appearance before the trial court was on September 17, 2024, and his notice of appeal (which we also construe as the first assertion of his

challenge to the trial court's jurisdiction) was filed on March 19, 2025. This amounts to a delay of approximately six months. Moreover, during that six-month period, respondent only appeared, by phone, at two hearings in this case. On September 17, 2024, respondent appeared by phone for the first time since the case was filed in March 2023. At that hearing, respondent was provided a copy of the State's petition to terminate his parental rights. Respondent appeared by phone again on December 12, 2024, and his attorney requested a continuance of the best-interest hearing because respondent requested a copy of the transcript of the fitness hearing held in his absence. Additionally, it is worth noting the fitness and best-interest hearings, which both occurred during this six-month period, were held in respondent's absence, despite requests to continue by his counsel. Based on the facts and circumstances of this case, we cannot find respondent's delay of six months between his first appearance and the filing of his notice of appeal (which, as in *Jamari R.*, we construed as his first assertion of the trial court's lack of personal jurisdiction) as a lack of due diligence. Consequently, because we find no lack of due diligence by respondent, the doctrine of *laches* does not apply.

¶ 44          3. *Unfitness Findings: Failure to Make Reasonable Efforts and Failure to Make Reasonable Progress*

¶ 45          Because we have determined the adjudicatory and dispositional orders are void *ab initio* and neither forfeiture nor *laches* apply, we must determine whether the void orders affect the trial court's findings of unfitness. Respondent and the State both cite this court's decision in *In re T.A.*, 359 Ill. App. 3d 953, 958-59 (2005), which held:

> "[W]hen the trial court's unfitness finding is *not* based on an assessment of the parent's compliance with the dispositional order in the neglect proceedings ***, the termination proceeding stands on its own. Accordingly, a flaw in the preceding

neglect proceedings—even a flaw that renders void an order entered therein—has no bearing on the subsequent termination case.

      "In so concluding, we fully recognize that a different result might be required if the respondent had been found unfit under section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2004)). Under that section, an unfitness finding is linked to the respondent's compliance with the directives he received in the neglect proceedings. Thus, the respondent's participation in those proceedings might be viewed as essential to a fair determination of whether he has made reasonable efforts to correct the conditions that led to his child's removal (750 ILCS 50/1(D)(m)(i) (West 2004)) or reasonable progress toward the child's return within a given time period (750 ILCS 50/1(D)(m)(ii), (D)(m)(iii) (West 2004))." (Emphasis in original.)

In that case, we determined the trial court's finding the respondent was an unfit parent based on his failure to maintain a reasonable degree of interest, concern, or responsibility would not be disturbed on appeal, despite prior adjudicatory and dispositional orders being void. *Id.* at 958-60. However, we declined to address whether void adjudicatory and dispositional orders would affect unfitness findings under section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2004)). In this case, we find it does. Because an unfitness finding under section 1(D)(m) of the Adoption Act "is linked to the respondent's compliance with the directives he received in the neglect proceedings" (*In re T.A.*, 359 Ill. App. 3d at 958-59), it is clear a respondent who did not receive notice of the neglect proceedings cannot be penalized for failing to comply with said directives. Here, respondent never had an opportunity to complete an integrated assessment due to the caseworker's inability to get in contact with him. Consequently, no services were assigned for him

- 16 -

to complete as part of the service plan. Therefore, he had no ability to make progress toward any dispositional goals for B.F. Additionally, respondent had no knowledge of the basis of B.F.'s removal until after the State's petition to terminate parental rights was filed. Based on this, it is incomprehensible he would be found unfit for failing to make reasonable progress to correct the conditions which led to B.F.'s removal. For those reasons, we find the court's findings of unfitness based on respondent's failure to make reasonable efforts to correct the conditions which led to B.F.'s removal and failure to make reasonable progress toward the return of B.F. to respondent's care cannot stand.

¶ 46　　　　　B. Unfitness Finding: Failure to Maintain a Reasonable Degree of Interest,

Concern, or Responsibility

¶ 47　　　　　Under the Juvenile Court Act, there is a two-stage process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2022). The first stage, commonly referred to as a fitness hearing, "focus[es] *** on the parent's conduct relative to the ground or grounds of unfitness alleged by the State." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The burden is on the State to "demonstrate by clear and convincing evidence that the parent is 'unfit' under one or more of the grounds set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2004))." *In re Veronica J.*, 371 Ill. App. 3d 822, 828 (2007). On review, this court affords great deference to the trial court's finding of parental unfitness and will not disturb that finding unless it is against the manifest weight of the evidence. *In re H.D.*, 343 Ill. App. 3d 483, 493 (2003). "A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48.

¶ 48    In this case, the trial court found respondent "[f]ailed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." See 750 ILCS 50/1(D)(b) (West 2022).

> "In deciding whether a parent's interest in, concern for, and responsibility toward the child's welfare have been reasonable in degree, the circuit court should consider the parent's efforts to visit the child and to otherwise maintain contact with the child, as well as the parent's inquiries into the child's welfare." *In re J.H.*, 2020 IL App (4th) 200150, ¶ 72.

The trial court "must 'examine the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred.' " *In re Adoption of H.B.*, 2012 IL App (4th) 120459, ¶ 42 (quoting *In re Adoption of Syck*, 138 Ill. 2d 255, 278 (1990)). "If personal visits with the child are somehow impractical, letters, telephone calls, and gifts to the child or those caring for the child may demonstrate a reasonable degree of concern, interest and responsibility, depending upon the content, tone, and frequency of those contacts under the circumstances." *Syck*, 138 Ill. 2d at 279; see *J.H.*, 2020 IL App (4th) 200150, ¶ 73 ("[The respondent]'s imprisonment in Florida made personal visits *** impractical. The question, then, was whether he demonstrated a reasonable degree of interest, concern, and responsibility by other means, such as by letters, telephone calls, and gifts to K.H. and by inquiries about her welfare."). Moreover, " 'a court is to examine the parent's efforts to communicate with and show interest in the child, not the success of those efforts.' " *In re M.I.*, 2016 IL 120232, ¶ 28 (quoting *Syck*, 138 Ill. 2d at 278-80).

¶ 49    In this case, the State failed to prove by clear and convincing evidence respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to B.F.'s welfare. To meet its burden, the State presented testimony from Snyder, the caseworker assigned to B.F.'s

case. However, Snyder admitted she never had any contact with respondent throughout her time as the assigned caseworker, despite efforts to contact him through prison staff. Additionally, when asked about respondent's involvement in B.F.'s life, Snyder testified "[respondent] had phone contact with [B.F.]." Snyder provided no other testimony about contact between respondent and B.F., other than stating she did not know whether respondent wrote letters to B.F. This testimony does not rise to the level of clear and convincing evidence respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to B.F.'s welfare. Moreover, respondent's counsel presented evidence from B.F.'s foster parent, Natalie, about respondent's attempts to check in on B.F. Natalie testified respondent contacted her "when he's able to" and inquired about B.F.'s welfare when he called. She explained that respondent had difficulty contacting her because of the security at the prisons and his transfers between facilities. Natalie further testified she last spoke with respondent a couple of weeks before the hearing. Based on the evidence presented at the fitness hearing, including testimony from the caseworker about her difficulty contacting respondent while incarcerated, it is clear the State failed to meet its burden. Respondent, based on his unique circumstances, maintained a reasonable interest in B.F.'s welfare through his phone contact with Natalie. Because the State failed to meet its burden to prove respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to B.F.'s welfare, the trial court's finding respondent was unfit on that basis was against the manifest weight of the evidence.

¶ 50                    C. Denial of Motion to Continue

¶ 51        Because we have determined the State failed to meet its burden by clear and convincing evidence respondent was an unfit parent as alleged in its petition, we need not address

- 19 -

his contention the trial court violated his due process rights when it denied his requests to continue the unfitness and best-interest hearings.

¶ 52                                    III. CONCLUSION

¶ 53         For the reasons stated, we vacate the trial court's order terminating respondent's parental rights and remand for further proceedings consistent with this order.

¶ 54         Vacated and remanded.

*In re B.F.*, 2025 IL App (4th) 250259

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Knox County, No. 23-JA-22; the Hon. Curtis S. Lane, Judge, presiding. |
| **Attorneys for Appellant:** | Zachary H. Vancil, of Clark & Glasgow LLC, of Monmouth, for appellant. |
| **Attorneys for Appellee:** | Ashley M. Worby, State's Attorney, of Galesburg (Patrick Delfino, David J. Robinson, and Connor Goetten, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |