2025 IL App (4th) 250740-U

NOS. 4-25-0740, 4-25-0741, 4-25-0742, 4-25-0743, 4-25-0744 cons.

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 17, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* Levey. I., Aava. I., Leven. I., Aave. I., and D.I., Minors | ) ) | Appeal from the Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
|     Petitioner-Appellee, | ) | Nos. 23JA26 |
|         v. | ) | 23JA27 |
| Latisha M., | ) | 23JA28 |
|     Respondent-Appellant). | ) | 23JA29 |
| | ) | 23JA275 |
| | ) | |
| | ) | Honorable |
| | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Presiding Justice Harris and Justice Doherty concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed, finding the trial court's decision to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 2   In February 2025, the State filed separate petitions to terminate the parental rights of respondent, Latisha M., as to her five minor children, Levey. I. (born in 2014), Aava. I. (born in 2015), Leven. I. (born in 2017), Aave. I. (born in 2021), and D.I. (born in 2023). In July 2025, the trial court granted the State's petitions and terminated respondent's parental rights as to all five children. The court also terminated the parental rights of the children's father, Levente I., who is not a party to this appeal.

¶ 3   On appeal, respondent argues the trial court's findings that (1) she was an unfit

parent and (2) termination of her parental rights was in her children's best interest were against the manifest weight of the evidence. We affirm.

¶ 4                                I. BACKGROUND

¶ 5                             A. Neglect Proceedings

¶ 6                    1. *Levey. I., Aava. I., Leven. I., and Aave. I.*

¶ 7        In February 2023, the State filed separate petitions for adjudication of wardship of Levey. I., Aava. I., Leven. I., and Aave. I., alleging that the children were neglected and abused pursuant to sections 2-3(1)(b) and 2-3(2) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b), 2-3(2) (West 2022)). Specifically, the State alleged (1) domestic violence between respondent and Levente (count I), (2) respondent and Levente had substance abuse issues (count II), (3) the children were being physically abused or at risk of physical abuse by Levente (count III), and (4) Levente inflicted excessive corporal punishment upon the children (count IV). Following a shelter care hearing, the trial court granted temporary custody of the children to the Illinois Department of Children and Family Services (DCFS).

¶ 8        In March 2023, respondent stipulated to count I of the petition and the remaining allegations were dismissed. The trial court adjudicated the children neglected. In July 2023, the court entered a dispositional order finding respondent was unfit, unable, or unwilling to care for the children, made the children wards of the court, and placed custody and guardianship of the children with DCFS.

¶ 9                                    2. *D.I.*

¶ 10       In December 2023, the State filed a petition for adjudication of wardship of D.I., alleging the child was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2022)). The State alleged D.I.'s environment was injurious to his welfare in

that (1) his siblings were previously adjudicated neglected and in the care of DCFS, (2) respondent and Levente had failed to make reasonable progress toward the return of his siblings, and (3) respondent had substance abuse issues. Following a shelter care hearing, the trial court granted temporary custody of the child to DCFS.

¶ 11        In December 2023, the trial court adjudicated D.I. neglected. In April 2024, the court entered a dispositional order finding respondent was unfit, unable, or unwilling to care for D.I., made D.I. a ward of the court, and placed guardianship and custody of D.I. with DCFS.

¶ 12                                B. Termination Proceedings

¶ 13        In February 2025, the State filed separate petitions to terminate the parental rights of respondent as to all five children. The State alleged respondent was unfit because she failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 2024)) (count I), (2) protect the children from the conditions within their environment injurious to their welfare (750 ILCS 50/1(D)(g) (West 2024)) (count II), (3) make reasonable efforts to correct the conditions which were the basis for the removal of the children within the relevant nine-month period (750 ILCS 50/1(D)(m)(i) (West 2024)) (count III), and (4) make reasonable progress toward the return of the children within the relevant nine-month period (750 ILCS 50/1(D)(m)(ii) (West 2024)) (count IV). The relevant nine-month periods for Levey. I., Aava. I., Leven. I., and Aave. I. were June 15, 2023, through March 15, 2024, and March 15, 2024, through December 15, 2024. The relevant nine-month period for D.I. was March 6, 2024, through December 6, 2024.

¶ 14                                1. *Fitness Hearing*

¶ 15        In May 2025, the trial court held a fitness hearing. Upon the State's request and without objection, the court took judicial notice of all prior court orders.

¶ 16        Patience Cheneyon, a caseworker with the Center for Youth and Family Solutions (CYFS), testified she was assigned to the children's case in February 2023. The State admitted into evidence the six service plans in this case. Under the initial service plan, respondent was required to cooperate with the agency and engage in parenting classes, domestic violence services, mental health treatment, substance abuse treatment, drug testing, and visitation.

¶ 17        Respondent completed parenting classes through The Parent Place. When asked about respondent's parenting skills, Cheneyon described her as "a great parent."

¶ 18        Respondent initially told Cheneyon she was no longer in a relationship with Levente. Cheneyon encouraged respondent to seek an order of protection against Levente, which she obtained in July 2023 in Sangamon County case No. 23-OP-1035. The order remained in effect until July 2025. Respondent successfully completed domestic violence services through Sojourn Shelter & Services, Inc. Thereafter, Cheneyon received information from a third party who reported ongoing contact between respondent and Levente. Respondent did not disclose those interactions until Cheneyon confronted her. According to the March 2024 permanency report, there were three police reports from January 2024 for domestic violence and a violation of the order of protection involving respondent and Levente. In March 2024, Levente was arrested for violating the order of protection after being found in a vehicle with respondent. Because of her ongoing contact with Levente, respondent was required to reengage with domestic violence services through Group Interventions, which she started in July 2024. Levente was arrested again in September 2024 for violating the order of protection. Respondent did not disclose the arrest to Cheneyon. While Levente was in jail, respondent told Cheneyon she was not in contact with him. However, Cheneyon discovered respondent was communicating with Levente by phone. According to the January 2025 permanency report, there were at least 100 phone calls between

respondent and Levente when he was in the Sangamon County jail. She completed the second round of domestic violence services in February 2025, but she continued to have contact with Levente.

¶ 19 Cheneyon testified respondent was at first doing well with mental health counseling but was later unsuccessfully discharged due to missed appointments. Respondent stopped attending counseling altogether after February 2025.

¶ 20 Cheneyon testified respondent was required to submit to drug testing through both CYFS and the substance abuse provider. Respondent had no positive drug tests with the substance abuse provider. Respondent was discharged from substance abuse services in October 2023. She reengaged with substance abuse services through Family Guidance Center but was unsuccessfully discharged for failing to inform them of her positive drug tests with CYFS. Respondent tested positive for barbiturates in October 2023, November 2023, and December 2023, but she was able to provide a valid prescription within a week of a court order. She tested positive for cocaine in November 2023 while she was pregnant with D.I., and when she gave birth a month later, she tested positive for cocaine and tetrahydrocannabinol (THC). In September 2024, respondent tested positive for ecstasy. Respondent tested positive for cocaine in September 2023, April 2024, May 2024, December 2024, and January 2025. Between November 2023 and January 2025, respondent tested positive for THC 21 times. She also consistently failed to appear, missing 14 of the 33 scheduled drug tests.

¶ 21 At the start of the case, respondent visited with the children twice a week at the agency. Visits were supervised and were not increased during that time. After July 2024, visitation was moved to respondent's home, and she was offered extra visits with D.I. However, the extra visits were inconsistent because respondent did not take advantage of the extra visitation time.

- 5 -

Visits never became unsupervised because respondent remained in contact with Levente.

¶ 22    Cheneyon testified respondent was initially cooperative with the agency. However, her cooperation became unsatisfactory after February 2025 due to her repeatedly changing her phone number or not having a phone, making it difficult for Cheneyon to contact her.

¶ 23    Cheneyon concluded that although respondent "started out pretty well, did engage in quite a few services and complete[d] many of them," she nonetheless continued to have a relationship with Levente and test positive for illicit substances. Cheneyon observed that respondent became inconsistent in engaging with her services and cooperation following the birth of D.I.

¶ 24    Respondent testified she was no longer in a relationship with Levente. She recalled ending the relationship around the time she became pregnant with D.I. She claimed the last time she spoke with Levente was in August 2024. Her relationship with Levente began in 2012, and he became violent toward her shortly thereafter. The trial court took judicial notice of multiple orders of protection respondent obtained against Levente in Sangamon County case Nos. 13-OP-1858, 14-OP-155, 14-OP-1636, 14-OP-1764, 16-OP-1715, 17-OP-608, 22-OP-1861, and 23-OP-1035. The court also took judicial notice of Sangamon County case No. 17-CM-323, where Levente was convicted of committing domestic battery against respondent.

¶ 25    Respondent testified she was not aware Levente took one of the children with him when he was buying methamphetamine. She admitted she knew the children witnessed Levente abusing her. Respondent explained she did not break up with Levente earlier because she did not realize their relationship was abusive. She acknowledged she was told at the start of the case that she could not be in a relationship with Levente if she wanted to regain custody of the children.

¶ 26    Respondent asserted she was no longer in contact with Levente by the time D.I.

was born in December 2023. According to respondent, Levente went to her home in January 2024 to retrieve some of his possessions. She stated she was voluntarily riding with Levente in her car when he was pulled over later that month. She denied that she called police five days later to remove Levente from her home. Respondent felt like the first round of domestic violence services did not help her. She admitted she did not tell Cheneyon about her contacts with Levente. Respondent conceded she was involved in another traffic stop in June 2024 where she was in her car with Levente.

¶ 27　　　　Respondent admitted she was using cocaine at the beginning of the case and again during the 2024 holidays. She explained she was with Levente in August 2024 because her car broke down and she relied on him for transportation. After Levente was arrested in September 2024 on drug charges, respondent frequently received jail phone calls from Levente. Respondent asserted she would not speak with Levente except to tell him to stop calling her. She never reported the calls as violations of the order of protection. The trial court continued the hearing until July 2025.

¶ 28　　　　The fitness hearing resumed in July 2025. Respondent was not present. The parties stipulated to the contents of the audio recordings of the jail phone calls between Levente and respondent.

¶ 29　　　　Madison Koehne, a CYFS caseworker, testified she was assigned to the children's case in June 2025. Since the last hearing, respondent had one drug test that was positive for cocaine, and she failed to appear for the remaining drug tests. Respondent requested another referral for substance abuse treatment. Koehne testified respondent had not visited the children since she became the caseworker, but a visit was scheduled within the next two weeks.

¶ 30　　　　The State admitted into evidence a flash drive containing jail phone calls between

Levente and respondent. The State played for the trial court two of the jail phone calls, which occurred in September 2024 and December 2024.

¶ 31    Respondent's counsel informed the trial court that she was able to contact respondent, who appeared by Zoom for the remainder of the hearing. Respondent denied she maintained contact with Levente and insisted he was the one who contacted her. She stated she missed her drug tests because her vehicle was broken down. Respondent admitted she had ongoing substance abuse issues despite successfully completing two courses of outpatient treatment. However, she confirmed she was willing to do inpatient treatment.

¶ 32    Respondent testified she was not required to engage in domestic violence services. She stated she was initially attending mental health counseling through CYFS but was now going to Central Counties Health Centers. Respondent did not have a job but was looking for one. She had a home and paid her bills with public assistance funds. Respondent stated she was not in a relationship with Levente and did not intend on getting back together with him.

¶ 33    The trial court found respondent unfit by clear and convincing evidence as to counts I, III, and IV. The court acknowledged respondent successfully completed the parenting classes and domestic violence services. However, respondent continued to have in-person contact with Levente throughout the relevant nine-month period. The court also noted respondent was unsuccessfully discharged from mental health counseling and continued to test positive for cocaine during the relevant period.

¶ 34    2. *Best Interest Hearing*

¶ 35    The trial court immediately proceeded to the best interest portion of the hearing. The court took judicial notice of all the evidence and testimony presented during the fitness hearing.

¶ 36 Koehne testified D.I. was placed with Aldora, who was fictive kin. This placement began around six months earlier. Koehne stated all of D.I.'s needs were being met and Aldora was willing to adopt him. D.I. shared a bedroom with Aldora's grandson, who was around 10 years old.

¶ 37 Levey. I. and Aava. I. were placed with Shanika F., who was fictive kin, in June 2025. Koehne stated the girls had their own beds and were comfortable in the placement. The girls told Koehne they were safe and happy with Shanika. Koehne stated it was too early to tell if the girls were forming an attachment to Shanika, but the girls had started opening up to her about their past trauma. Shanika was willing to adopt the girls.

¶ 38 Leven. I. and Aave. I. were placed with Brenda J., who was fictive kin, in June 2025. Koehne stated the boys' needs were being met. However, Brenda told Koehne she needed more time to decide whether she was willing to adopt the boys.

¶ 39 The children saw each other every other day at daycare. If parental rights were terminated, the foster parents were committed to maintaining the siblings' relationships. Aldora and Brenda were not willing to continue the children's relationship with respondent if her parental rights were terminated. Koehne stated the agency "most definitely" could find an adoptive home for Leven. I. and Aave. I. if their current placement did not become an adoptive placement. She had not observed respondent interacting with the children since taking over the case. According to the case notes, visitation went well between respondent and the children. Koehne opined it was in the best interest of the children to terminate respondent's parental rights.

¶ 40 Respondent testified she was close with the children and they had a bond with her as their mother. She expressed concern with the children being placed in three different foster homes. Respondent believed it was in the best interest of the children if they were placed with her.

She stated she would continue engaging in services if the children were returned to her.

¶ 41     The trial court found it was in the best interest of the children to terminate respondent's parental rights. The court stated it considered all the statutory best interest factors. At the time of the hearing, the children had been in care for almost two and a half years. As to D.I., the court noted he had been in care his entire life and his current placement was willing to adopt him. Although the four other minors were new to their current placements, they all appeared to be acclimating well. The court found the minors were no closer to being returned to respondent's care. In particular, the court noted respondent's continued substance abuse and contact with Levente. Although Brenda had not committed to adopting Leven. I. and Aave. I., the court found the boys' need for permanence weighed in favor of termination.

¶ 42     This appeal followed.

¶ 43                              II. ANALYSIS

¶ 44     On appeal, respondent argues the trial court's unfitness and best interest determinations were against the manifest weight of the evidence.

¶ 45     The Juvenile Court Act provides a two-step process for the involuntary termination of parental rights. *In re B.F.*, 2025 IL App (4th) 250259, ¶ 47. The State must first prove that a parent is "unfit" by clear and convincing evidence, as the term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *B.F.*, 2025 IL App (4th) 250259, ¶ 47. If a parent is found unfit, the State must then prove it is in the best interest of the child to terminate the parent's rights. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). A reviewing court will not reverse the trial court's fitness or best interest determinations unless they are against the manifest weight of the evidence. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33. A trial court's determination is against the manifest weight of the evidence "only if the facts clearly demonstrate that the trial court should

- 10 -

have reached the opposite result." *J.B.*, 2019 IL App (4th) 190537, ¶ 33. We afford great deference to the trial court's findings "because of its superior opportunity to observe the witnesses and evaluate their credibility." *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067 (2004).

¶ 46                                    A. Unfitness

¶ 47         Respondent argues the trial court's finding that respondent was unfit was against the manifest weight of the evidence.

¶ 48         We must first address the deficiencies in respondent's brief. Although the trial court found respondent unfit on three separate grounds, namely, the failure to (1) maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare, (2) make reasonable efforts to correct the conditions which were the basis of the children's removal, and (3) make reasonable progress toward the return of the children—the only ground she addresses with some specificity is the reasonable degree ground. Her argument as to the reasonable progress ground consists of a single paragraph with no citation to relevant authority, and she simply does not address the finding that she failed to make reasonable efforts to correct the conditions that led to the children's removal. "A finding of parental unfitness may be based on evidence sufficient to support any one statutory ground." *Jordan V.*, 347 Ill App. 3d at 1067. As such, because respondent failed to set forth a cogent argument as to the reasonable efforts and reasonable progress grounds, we may affirm on either basis without addressing her reasonable degree argument. However, as the reasonable degree argument is straightforward, we will address it.

¶ 49         Section 1(D)(b) of the Adoption Act defines an unfit parent as one who fails to maintain a reasonable degree of interest, concern, or responsibility as to her children's welfare. 750 ILCS 50/1(D)(b) (West 2024). Because the language of section 1(D)(b) is stated in the disjunctive, any of the three elements on their own can be the basis for an unfitness finding (*i.e.*,

the failure to maintain a reasonable degree of interest *or* concern *or* responsibility). *In re Shauntae P.*, 2012 IL App (1st) 112280, ¶ 90. The trial court should consider the reasonableness of the parent's efforts to maintain a reasonable degree of interest, concern, or responsibility regarding her children, rather than the success of her efforts. *Shauntae P.*, 2012 IL App (1st) 112280, ¶ 90. To that end, the court should also account for any circumstances in the parent's life that may unduly interfere with her efforts, such as poverty, lack of transportation, or the conduct of others. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). A parent will not be found fit merely because she has "demonstrated some interest in or affection for her child." *Daphnie E.*, 368 Ill. App. 3d at 1064. "Noncompliance with an imposed service plan, a continued addiction to drugs, a repeated failure to obtain treatment for an addiction, and infrequent or irregular visitation with the child have all been held to be sufficient evidence warranting a finding of unfitness under subsection (b)." *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004).

¶ 50        The primary reasons for removal in this case were (1) domestic violence between respondent and Levente and (2) respondent's substance abuse issues. Although respondent insisted she was no longer in a relationship with Levente, her contacts with Levente substantially increased following the birth of D.I. in December 2023. Throughout 2024, Cheneyon received multiple police reports evidencing ongoing domestic violence and contact in violation of the order of protection between respondent and Levente. Respondent admitted many of these contacts were voluntary. She also did not tell Cheneyon about her contacts with Levente unless Cheneyon confronted her with evidence of the interactions. Because of this, respondent was required to complete a second round of domestic violence services. However, in January 2025, Cheneyon discovered there were at least 100 phone calls between respondent and Levente while he was in jail. Despite completing two rounds of domestic violence services, respondent failed to

meaningfully apply what she learned, as demonstrated by her secretly maintaining her relationship with Levente and her repeated attempts to hide the relationship from her caseworkers.

¶ 51 Respondent similarly showed no improvement in the substance abuse requirement under the service plan. For the drug tests through CYFS, she tested positive for cocaine in September 2023, April 2024, May 2024, December 2024, January 2025, and May 2025. Between November 2023 to January 2025, respondent tested positive for THC 21 times. Respondent was unsuccessfully discharged by Family Guidance Center after it was discovered she had not disclosed her positive drug tests to them. She also consistently failed to appear, missing nearly half of the scheduled drug tests. According to respondent, she missed some of the drug tests scheduled after August 2024 due to her vehicle breaking down. However, this does not explain her earlier absences, as respondent routinely failed to appear for drug tests even when she had access to an operable vehicle.

¶ 52 To reiterate, this court may consider respondent's noncompliance with her service plan and continued use of illicit substances when assessing whether she maintained a reasonable degree of responsibility as to her children's welfare. See *Jaron Z.*, 348 Ill. App. 3d at 259. Respondent's inability to make any improvement whatsoever in the areas which led to the removal of her children, namely, domestic violence and substance abuse, is more than enough to render the trial court's unfitness determination reasonable. We therefore conclude the court's finding that respondent was unfit for failing to maintain a reasonable degree of interest, concern, or responsibility as to her children's welfare was not against the manifest weight of the evidence. As discussed above, we need not address the remaining grounds of unfitness, as affirming any statutory ground is sufficient to support an unfitness finding. *Jordan V.*, 347 Ill App. 3d at 1067.

¶ 53 B. Best Interest

¶ 54 Respondent contends the trial court's finding that it was in the children's best interest to terminate her parental rights was against the manifest weight of the evidence.

¶ 55 At the best interest hearing, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 64. In determining whether termination of parental rights is in a child's best interest, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> " '(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child.' " *Ta. T.*, 2021 IL App (4th) 200658, ¶ 64 (quoting *J.B.*, 2019 IL App (4th) 190537, ¶ 32).

See 705 ILCS 405/1-3(4.05) (West 2024).

¶ 56 Respondent first argues the trial court erred in holding the fitness and best interest hearings on the same day. We find respondent has forfeited this issue, as she has failed to cite any authority in support of her argument. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *In re P.S.*, 2021 IL App (5th) 210027, ¶ 57 ("Arguments that are not supported by citations to legal authority

do not meet the requirements of Rule 341(h)(7) and are procedurally defaulted on appeal."). Even if we were to excuse her forfeiture, respondent's argument is unavailing.

> "A separate hearing and determination of the child's best interests is mandatory in order to ensure the proper focus on those interests. That need not be a lengthy or burdensome process, *as the fitness and best interest hearings may be held one right after the other*, with an unfitness determination necessary before going forward." (Emphasis added.) *In re A.P.*, 277 Ill. App. 3d 592, 600 (1996).

¶ 57 In this case, after pronouncing respondent unfit, the trial court stated, "That will bring an end to that portion of the proceedings." Following a brief recess, the court proceeded to the best interest portion of the hearing. Illinois courts routinely follow this practice for fitness and best interest hearings. See, *e.g.*, *In re M.D.*, 2022 IL App (4th) 210288, ¶ 42; *Shauntae P.*, 2012 IL App (1st) 112280, ¶ 68; *P.S.*, 2021 IL App (5th) 210027, ¶ 19. Respondent provides no compelling reason to depart from this existing procedure.

¶ 58 Respondent next asserts the trial court disregarded several best interest factors, specifically, factors (3), (4), and (10). However, "[t]he trial court need not explicitly reference each of [the best interest] factors, and this court need not rely on any basis used by the trial court in affirming its decision." *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 27. Respondent fails to cite any portion of the best interest hearing that indicates the court purposefully disregarded those factors. To the contrary, the court clearly stated on the record, "As I always do, I have the statute book open to the best interest factors. I am considering them all whether or not I read through them all."

¶ 59 Here, the record supports the trial court's determination that termination of respondent's parental rights was in the children's best interest. At the time of the hearing, the

children had been in custody for almost two and a half years. Although the children were placed in three different foster homes, the children saw each other every other day at daycare, and the foster parents had committed to continuing the sibling relationships. All of the children's needs were being met at their respective placements. D.I. had never lived with respondent, and Koehne observed a strong bond between D.I. and his foster mother during home visits. Levey. I. and Aava. I. told Koehne they felt safe and happy in their foster home, and they had begun to open up to their foster parent about their past life events. Leven. I. and Aave. I. also told Koehne they felt happy and safe in their foster home. Levey. I.'s, Aava. I.'s, and D.I.'s foster parents all expressed interest in adopting the children. Although Leven. I. and Aave. I.'s foster parent was still unsure about adoption, Koehne stated it would not be difficult to find a different adoptive home if their current placement did not work out. Accordingly, the court's finding that it was in the best interest of the children that respondent's parental rights be terminated was not against the manifest weight of the evidence.

¶ 60                                  III. CONCLUSION

¶ 61          For the reasons stated, we affirm the trial court's judgment.

¶ 62          Affirmed.